# EXHIBIT B

1              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                21-CR-265(PKC)
3    UNITED STATES OF AMERICA,
                                United States Courthouse
4         Plaintiff,            Brooklyn, New York

5         -against-            January 15, 2025
                               10:00 a.m.
6    YONG ZHU,

7         Defendant.

8    ------------------------------x

9         TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
           BEFORE THE HONORABLE PAMELA K. CHEN
10              UNITED STATES DISTRICT JUDGE

11   APPEARANCES

12   For the Government:     CAROLYN POKORNY, ESQ.
                            ACTING UNITED STATES ATTORNEY
13                          Eastern District of New York
                            271 Cadman Plaza East
14                          Brooklyn, New York 11201
                            BY:  MEREDITH ASHLEY ARFA, ESQ.
15                               IRISA CHEN, ESQ.
                                 CHRISTINE ANN BONOMO, ESQ.
16                          Assistant United States Attorneys

17   For the Defendant:     LAW OFFICE OF BENJAMIN SILVERMAN
                            224 West 30th Street, Suite 302
18                          New York, New York 10001
                            BY:  BENJAMIN SILVERMAN, ESQ.
19
     Also Present:          YONG ZHU, DEFENDANT
20                          PROBATION OFFICER TONER
                            SPECIAL AGENT BUONO
21                          NANCY WU, INTERPRETER

22
     Court Reporter:        AVERY N. ARMSTRONG, RPR, NYRCR
23                          Phone:  718-613-2419
                            Fax:    718-613-2639
24                          Email:  Aarm.edny@gmail.com

25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.

1                (In open court.)

2                THE COURTROOM DEPUTY:  Criminal cause for a

3       sentencing docket 21-CR-265, United States versus Yong Zhu.

4                Will the parties please state their appearances for

5       the record starting with the Government.

6                MS. CHEN:  Good morning, Your Honor.  Irisa Chen for

7       the Government.  I'm joined by Meredith Arfa, as well as

8       Christine Bonomo, child attorney from the National Security

9       Division, Officer Jeremy Toner from probation and Special

10      Agent Christopher Bruno from the FBI.

11               THE COURT:  All right.  Good morning to all of you.

12               MS. ARFA:  Good morning, Your Honor.

13               MR. SILVERMAN:  Good morning, Your Honor.

14               Benjamin Silverman, here with Zhu Yong and we also

15      have with us today his son, Ju Li and his daughter-in-law

16      Maggie Wong.  They're sitting -- they're standing now in the

17      front row of the gallery.

18               THE COURT:  All right.  Good morning to all of you,

19      as well.  Have a seat.

20               Let's swear in our interpreter.

21               (Whereupon, NANCY WU was sworn as interpreter.)

22               THE INTERPRETER:  Yes, I do.

23               THE COURTROOM DEPUTY:  Please state, spell your

24      name, and then the language you're interpreting.

25               THE INTERPRETER:  Nancy Wu, W-U.  Mandarin

1    interpreter.

2              THE COURT:  Okay.  Good morning to you.

3              Everyone can remain seated during the proceedings so

4    that you can use the microphones.  We are here for sentencing

5    in this matter.  Let me start off by placing a few things on

6    the record.  And, Ms. Wu, let me know if, at any point, I go

7    too quickly or I don't speak clearly enough for you.

8              On June 20, 2023, the defendant was convicted at

9    trial by jury of all four counts of the superseding S-1

10   indictment.  Count One charges him with conspiracy to act as

11   an agent of the Chinese Government without prior notification

12   to the attorney general as required by law, Count Two charges

13   him with acting as an agent of the Chinese Government without

14   prior notification to the attorney general as required by law.

15   Count Three charges him with conspiracy to engage in

16   interstate stalking with respect to John Doe 1, and Jane

17   Does 1 and 2, and then finally, Count Four charges him with

18   interstate stalking with respect to John and Jane Doe 1.

19             I've received and reviewed in preparation for

20   sentencing, the following:  The presentence report dated

21   October 11, 2024, and an addendum to that report dated

22   January 7, 2025.  The presentence report in October was

23   accompanied by a presentence -- probation department

24   sentencing recommendation.  The parties should have received a

25   copy of that before today.

1          Did the Government get that?

2          MS. CHEN:  Yes, Your Honor.

3          THE COURT:  And the defense?

4          MR. SILVERMAN:  Yes, Your Honor.

5          THE COURT:  Okay.  I've received the defense's

6    sentencing submission dated January 3, 2025, and a supplement

7    to that on January 14, 2025.  The defendant's sentencing

8    submissions include letters of support for the defendant.

9          I also have received and reviewed the defense letter

10   to probation objecting to portions of the presentence report.

11   I've received the Government's sentencing submission dated

12   January 10, 2025, as well as the Government's presentence

13   report objections dated October 25, 2024.

14         Is there anything else I should have from the

15   Government?

16         MS. CHEN:  No, Your Honor.

17         THE COURT:  From the defense?

18         MR. SILVERMAN:  No, Your Honor.

19         THE COURT:  Okay.  Mr. Silverman, if you and your

20   client reviewed and discussed the probation department's

21   presentence report and addendum, as well as their sentencing

22   recommendation?

23         MR. SILVERMAN:  Yes, Your Honor.

24         THE COURT:  Okay.  Let's -- is either side --

25   sorry -- seeking an evidentiary hearing on any issue relating

1    to sentencing?

2            Government?

3            MS. CHEN:  No, Your Honor.

4            MR. SILVERMAN:  No, Your Honor.

5            With the caveat that with respect to the vulnerable

6    victim enhancement, there is an argument that the Government

7    made that we'd like to address with a proffer.  We don't think

8    it requires a hearing and, in fact, we think it's something

9    that's also reflected in the Government's letter.  But we

10   would like to make sure that it's clear for the record.  And

11   this is, of course, not just a two-level enhancement but it's

12   a four-level adjustment to the guidelines because it precludes

13   the Zero-Point Offender reduction, so it's quite significant

14   in terms of how it affects the guidelines computation from

15   level 25 to what we believe would be appropriately, 21.

16           We also believe that other ways that the guidelines

17   are calculated would -- are inappropriate and that it should

18   be lower than that.  But just this one enhancement is a

19   four-level swing in the guidelines.  And we believe it can be

20   resolved on the legal question of whether there's a nexus and

21   on Page 14 of the Government's letter, they asked the Court to

22   find that because the PRC Government had the ability to bring

23   Mr. Zhu's sister here instead of his father that the Court

24   should therefore find that they selected the father based on

25   his vulnerability.

1          We think that's not only speculation rather than

2   anything that could be found based on a preponderance of the

3   evidence, but it's also contra the evidence which is what I

4   want to point out.  And, in fact, on the next page of the

5   Government's letter, it notes the importance of filial piety

6   in a Confucian society, and so the father is not the sister.

7   And so familial love is important for any sibling or anyone in

8   one's family, but the parents are different in nature and so

9   we think that --

10         THE COURT:  Why don't you save this for later.  What

11   you are trying to say, I guess, in response to my question is

12   you want to reserve the possibility that you might seek a

13   *Fatico* on this issue but I doubt you'll need it.

14         MR. SILVERMAN:  Thank you, Your Honor.  We

15   understand.

16         THE COURT:  So why don't you hold your thoughts for

17   now.

18         MR. SILVERMAN:  Thank you.

19         THE COURT:  Okay.  So, Government, we're all victims

20   of the crimes committed by the defendant notified of their

21   right to attend the sentencing and speak at the sentencing.

22         MS. CHEN:  Yes, Your Honor.  They were notified and

23   they have opted not to appear and speak today.

24         THE COURT:  Okay.  I'm obviously aware of the victim

25   impact statements that they've provided to the probation

1    department and which are set forth in paragraphs 105 and 106

2    of the presentence report.  So I have reviewed those before

3    today.  Let's turn now to the guidelines calculation and we do

4    have a number of objections as previewed in part by

5    Mr. Silverman to address.

6              So first of all, the question arises as to Counts

7    One and Two, whether or not there is an analogous or

8    sufficiently analogous guidelines provision for those two

9    counts which charge a violation of Section 951 relating to

10   being an agent of a foreign Government but not registering

11   with the attorney general.

12             The probation department and the Government have

13   taken the view that there isn't a sufficiently analogous

14   sentencing guidelines provision and there obviously isn't one

15   that applies or references this crime directly and that,

16   therefore, I should apply the sentencing factors under Section

17   3553(a), which is what the sentencing guidelines direct where

18   there's no sufficiently analogous guideline provision.

19             The defense objects and argues that the stalking

20   guidelines that are applied to Counts Three and Four -- and

21   I'm going to quote Mr. Silverman -- "best encompass the

22   charged improved conduct," end quote, in Counts One and Two.

23   Mr. Silverman argues that the conduct that supports the

24   stalking charges in Counts Three and Four is almost all the

25   same conduct that supports the charges in Counts One and Two

1   and, that, I think, fairly summarizes the gist of your

2   argument.

3              The probation department responds in the addendum

4   that relying on the stalking guideline to capture the conduct

5   of being an unregistered foreign agent appears to undercut

6   Counts One and Two entirely, and I'm excerpting from what

7   their response was.

8              Mr. Silverman, you could be heard on this further,

9   if you'd like.  But I'll tell you that I do agree with the

10  Government and the probation department and I'm happy to

11  explain why.  But if you'd like another opportunity to argue

12  this further, please do.

13             MR. SILVERMAN:  Thank you, Your Honor.

14             I won't belabor the points that we've preserved, but

15  there is one additional thing that I want to add, which is

16  what we're really trying to avoid here, is what we think is

17  triple counting by probation and double counting by the

18  Government.  And I'll explain what I mean.  So there's a

19  two-level enhancement that's applied for a pattern of

20  stalking.  But then the pattern of stalking is broken into

21  separate conspiracies.  So there's three levels added for

22  grouping.  So you have three levels for grouping and two

23  levels for a pattern enhancement that are really applying for

24  the same thing.  And then when probation -- so that's double

25  counting in our view.  And then when probation adds

1   consecutive time for Counts One and Two, we view that as

2   triple counting because this is all coterminous, relevant

3   conduct that's tied together.  And so what we're really trying

4   to do -- because certainly when there's no referenced

5   guideline it always creates difficulty.  But what we're really

6   trying to do is to avoid multiple counting for the same

7   aggravating feature, which is that there were multiple people

8   who were victimized by the conspiracy.  And there are --

9            THE COURT:  Go ahead.

10           MR. SILVERMAN:  I just -- the only other thing I

11  would add in response to the probation addendum is that

12  probation's explanation that the Court just quoted we think

13  misunderstands how the guidelines work.  And I appreciate that

14  probation does a lot more guidelines calculations than lawyers

15  do.  But under 3D1.4, for example, if there's more than a

16  nine-level difference between different kinds of conduct, the

17  lower conduct doesn't impact the guidelines at all.

18           So the idea that the guidelines necessarily require

19  that separate conduct increase the sentences wrong and here

20  what we have is relevant conduct, so I think probation's

21  entire explanation for why consecutive time is necessary

22  misapprehends how the guidelines function.  Sometimes there's

23  a grouping analysis in this case the way we would have grouped

24  would have increased by one level, which is a modest increase.

25  Sometimes the grouping increase provides for no increase, but

1  it certainly doesn't necessarily require an increase, so we

2  just think that that's mistaken.  But the real issue, as I

3  said, is that we're trying to avoid double or triple counting

4  for the same feature of the offense.

5          THE COURT:  Right.  So you're arguing essentially

6  that there's some multiplier effect by virtue of how the

7  guidelines get calculated if they're treated -- if one is

8  treated outside the guidelines regime and I guess one is

9  treated within the guidelines regime?

10          MR. SILVERMAN:  Yes, Your Honor.

11          THE COURT:  But I think that argument, which I'm not

12 saying has no merit, is better addressed as an argument about

13 the overstatement of the guidelines with respect to the

14 seriousness of the crime committed by this particular

15 defendant, because, again, what we're dealing with is the

16 theoretical or prescribed application, the formulaic

17 application, if you will, of these numeric guidelines.

18          It's often the case that the guidelines application,

19 which is technically correct, still overstates the seriousness

20 of a particular defendant's criminal activity for the reasons

21 that you say.  The somewhat unforeseen consequences of having

22 a conspiracy with many acts that were committed and, as I'm

23 going to tell you, spoiler alert, I think correctly get

24 counted as multiple offenses for the reasons that have been

25 set forth in the papers.

1          And so therefore, obviously, the guidelines cannot

2   contemplate every iteration or application of them.  And so I

3   think your argument is better used to say that here there

4   is -- or rather, here, the guidelines overstate the

5   seriousness of his criminal conduct for the reason that you

6   just said.  And you don't even have to repeat it, you could

7   just refer back to it later.

8          But the reason I'm going to disagree with you is

9   because I think the guidelines should be calculated faithfully

10  and then all of these exceptions or maybe deviations or

11  variances from it can be discussed independently.

12         So let me explain why it is, I think, that probation

13  actually is correct and, in fact, I think the way they phrased

14  it is also correct, because while it's true that the physical

15  acts or conduct that supports these two sets of charges,

16  stalking on the one hand, and being an unregistered foreign

17  agent on the other, is largely the same.  There are obviously

18  some differences like not registering and knowingly working

19  for the Chinese Government, those are major ones, I would say.

20  But I agree with probation that -- and the Government -- that

21  applying the stalking guidelines would negate what is the very

22  distinct features and purposes with respect to these two

23  different sets of crimes.

24         Unlike the stalking offense, the critical element of

25  the foreign agent offense is the defendant's knowing

1    involvement with a foreign government to carry out that

2    foreign government's directives with respect to persons and

3    things in this country, all while not alerting the U.S.

4    Government about those activities.  It is the intrusion and

5    interference into the affairs of the U.S. citizens and

6    residents and the compromising of U.S. National Security

7    interests that is at the heart of the foreign agent crime, and

8    that doesn't appear, of course, anywhere in terms of the

9    purpose or harms trying to be prevented by the stalking crime.

10           Now, obviously, as we all recognize here, there's an

11   overlap because the conduct that was used to carry out the

12   foreign agent crime was stalking or involved stalking, I

13   should say, as a subset of what was going on.  But the harms

14   that are policed or sought to be prevented by the stalking

15   crimes are different.  They're typically smaller in scope and

16   very different in character.  But as here there is an overlap.

17   But I don't think it's one that should prompt me to basically

18   discount the very different and purposely very different goal

19   of the foreign agent statute, the Section 951 crime.

20           So I am going to find that the stalking guidelines

21   provision is not sufficiently analogous to apply to Counts One

22   and Two because really all that the statutes have in common is

23   the physical actions involved or some of the physical actions

24   involved, and the stalking guidelines do not sufficiently

25   reflect or encompass the broader purposes and goals of the

1   foreign agent registration statutes or Section 951.  So I am

2   going to rely, instead, on the 3553(a) sentencing factors in

3   determining an appropriate sentence for Counts One and Two.

4   And, of course, I have to consider them in any event when

5   deciding on an appropriate sentence for Counts Three and Four,

6   as well.

7          Now, let's turn to the vulnerable victim objection

8   or issue.  The defense has objected to the two-level

9   enhancement with respect to the stalking conspiracy

10  conviction, specifically as to John Doe 1's father, who is

11  John Doe 2.  The defense argues that there's no evidence that

12  the defendant knew that John Doe 2 would be brought to the

13  U.S., that John Doe 2's vulnerability had no nexus to the

14  charged crime, that even if the defendant knew John Doe 2 was

15  being brought to the U.S., there's no evidence that the

16  defendant knew John Doe 2 was infirm, versus -- and this is a

17  quote -- "merely elderly."

18         And then obviously, I think you've added an

19  argument, as well, based on what the Government has said about

20  choosing the less vulnerable victim or at least the Government

21  choosing to send the father, instead of the sister thereby

22  enhancing the notion that he qualifies as someone who's

23  vulnerable.

24         I do agree with you, Mr.-- starting I guess

25  backwards -- I do agree with you, Mr. Silverman that I wasn't

1    particularly convinced about this argument about picking the

2    younger or the older versus the younger family member.  I

3    think in this situation, there are other reasons, none of

4    which we all will know or could know, why the father would be

5    picked.  But I do agree that there's something about having

6    someone's parent as opposed to someone's sister come and try

7    to convince you to take a very grave action, namely return to

8    the country that wants to prosecute you, is probably why the

9    father was chosen or likely would be the reason the father was

10   chosen over the sister.  I also wondered because there were

11   references to the sister being jailed for two years, so I

12   don't actually know where she was at the time that the visit

13   occurred.  But I didn't bother to go back and match up the

14   dates.

15           So I'll hear from both parties further, but I have

16   to say to the Government this time that I'm more inclined to

17   agree with the defense on this.  And quite frankly, I didn't

18   actually realize that there was an additional two levels that

19   would be affected because of the Zero-Point Offender

20   guidelines.  That isn't something that I focused on.  And I

21   don't think the parties necessarily mentioned it.  So I gather

22   the Zero-Point Offender benefit cannot be applied if the crime

23   involved a vulnerable victim?

24           MS. CHEN:  I think that's correct, Your Honor.  And

25   we can address this more should we need to.  But there are

1   also additional reasons why the Zero-Point Offender reduction

2   would not apply in this case, notably, that there was a

3   credible threat of violence, including the 2018 threatening

4   note that was posted on the victim's door.  So we would also

5   argue for that reason, it's a separate reason why the

6   Zero-Point Offender reduction would not apply, setting aside

7   the vulnerable victim.

8           THE COURT:  And it wasn't applied here, I noticed in

9   the guidelines calculation, right?

10          MS. CHEN:  It was not applied here, Your Honor.

11          THE COURT:  Right.  Okay.  So that might not be a

12  genuine issue.  But let me hear from the Government on why I

13  should apply this vulnerable victim enhancement.

14          MS. CHEN:  Sure, Your Honor.

15          So I think a couple of facts I think that are

16  notable here.  First is John Doe 2's age which hasn't really

17  been discussed.  Rather, we've been discussing whether or not

18  he was infirmed or ill, which he was, as the record supports

19  that he had a brain hemorrhage in early 2017.  The Government

20  also argues that the defendant did know about the use of

21  John Doe 2 in connection with this overall conspiracy given

22  that in his post-arrest statement he notably said that he was

23  aware that Xu Jin's father was brought to the United States in

24  an effort --

25          THE COURT:  I'm going to stop you for one second.

1        Did you, folks, provide spellings of all these names

2    to the court reporter?

3        MS. CHEN:  We have not, but we can.

4        THE COURT:  Okay.  So you'll have to do so

5    afterwards.  That's why in part I was using John Doe 1 and 2.

6    It just might be easier on the court reporter, but go ahead.

7        MS. CHEN:  Understood.  We'll do our best to also

8    use John Doe, Your Honor.

9        So John Doe 1, the defendant said that he knew that

10   John Doe 1's father was brought to the United States in an

11   effort to convince his son to go back to China.  And so the

12   Government would argue on that basis alone that shows that the

13   defendant was certainly aware of the April 2017 operation to

14   bring John Doe 2 to the United States.

15       And, Your Honor, I think there is not enough focus,

16   frankly, on John Doe 2's age as appropriately triggering this

17   enhancement, given that particularly, at trial, Jane Doe 1, as

18   well as her sister, both testified to their reaction of an

19   80-year-old man being essentially dropped on Jane Doe 1's

20   sister's doorstep.  And we noted that in the Government's

21   sentencing submission as frankly, getting the reaction that

22   the co-conspirators here wanted, which is that this is such an

23   egregious act that it may very well intimidate, harass, and

24   otherwise, get John Doe 1 to do, frankly, exactly what the

25   co-conspirators wanted to return to China or to, otherwise,

1   disclose his location which, of course, the trial evidence

2   shows did occur as part of that incident.

3            THE COURT:  Can I ask you one question in that

4   regard.  You refer the probation department to trial

5   Exhibit 1020.  And then the probation department refers to

6   bullet points.  What was Exhibit 1020?  Because I think it was

7   offered also to show -- maybe that was the post-arrest

8   interview.  No, they can't --

9            MR. SILVERMAN:  We have a copy if Your Honor would

10  like a copy.

11           THE COURT:  Okay.  If someone will hand it up.  I

12  was just wondering, because the probation department might

13  have thought it was relevant to showing what I'm -- I'm

14  interested in, in part is the defendant's knowledge of all

15  these things.  Not just the effort to have the father convince

16  the son to return home, but rather, the defendant's knowledge

17  of the age of the father, as well as any infirmities he had,

18  such as, I assume, there's no evidence the defendant knew of

19  the father's heart condition et cetera.

20           MS. CHEN:  That's right.

21           And, Your Honor, Government Exhibit 1020 is an

22  e-mail attachment sent by, if you'll recall, the translator

23  that the defendant was working with, sending the personal

24  identifying information and other personal information to

25  codefendant Michael McMahon, in, I believe, October of 2016

1   when they're originally engaging Defendant McMahon in

2   investigating the victims and his family.

3           And in that attachment, there's obviously detailed

4   information including Social Security numbers and other

5   information about John Doe 1 and his family, but also,

6   notably, a photograph of John Doe 2 and his wife, they're

7   visibly older, and you can see that already in that

8   attachment, the defendant is asking McMahon to follow John

9   Doe 2 while he's in the U.S. and try and use him as part of

10  this scheme already.  And so that's why the Government

11  directed probation to that particular exhibit because it

12  certainly shows that the defendant here knew that John Doe 2

13  was involved in this scheme and that he was being used in a

14  manner to track down John Doe 1.

15          THE COURT:  All right.

16          Mr. Silverman.

17          MR. SILVERMAN:  Your Honor, a couple of things.

18  First, we think that this entire issue can be resolved on the

19  legal question, which I don't think is in dispute between the

20  parties which is -- was the person -- is there an ability for

21  the Court to find by a preponderance that the person was

22  chosen on account of their disability.  That's the *McCall*

23  case, and I'm quoting from 174 F.3d at 51.  The correct test

24  calls for an examination of the individual victim's ability to

25  avoid the crime, rather than their vulnerability relative to

1   other potential victims of the same crime.

2              So first, legally, does anything with the

3   Government's proffer make him more unable to avoid the crime,

4   and the answer we think is clearly no.  This is not like a

5   telemarketing scam where someone with reduced cognition is

6   more likely to be susceptible.  Any citizen of the PRC, anyone

7   within the domain of the PRC Government would have been

8   susceptible to exactly this and the vulnerability did not

9   heighten the exposure to the offense or their chance at being

10  victimized.  And so we think just based on that legal reason

11  alone, based on *McCall* that is inappropriate to apply the

12  vulnerable victim enhancement.

13             In addition, in terms of certain facts that have

14  been stated, I want to note that in Government's Exhibit 1020,

15  which we've now handed up to the Court, the photo I see in

16  that picture -- and I want to distinguish that picture from a

17  video that's referenced in the Government's letter -- this is

18  the picture that my client had, I see a man who's not, you

19  know, in his prime, but he's wearing a North Face

20  athletic-looking jacket, does not look to me like someone who

21  has trouble walking.

22             And what it says in that letter which I believe was

23  transmitted in 2016, is that he is in the United States and

24  leaving the United States, and there's no suggestion that he

25  was forced to be here.  Quite the opposite, nor is from any

1    suggestion that he's having trouble traveling independently.

2    So this is the ex-ante knowledge that my client has.  There is

3    a reference that the Government made to the post-arrest

4    statement.

5            The post-arrest statement is a garbled and confusing

6    statement and, in part, it very substantially confuses the

7    timelines of things.  It's the kind of statement that someone

8    makes when they're not prepared by a lawyer in advance of

9    making a statement.  And it confuses things that he knew

10   beforehand what things that he knew after the fact.  The

11   timeline is very clearly mistaken because what happened -- and

12   I want to be very clear we are not arguing about what happened

13   with John Doe 2.  And my definition is John Doe 1 being Xu

14   Jin, X-U-J-I-N, and John Doe 2 being the father.

15           THE COURT:  Hold on.  X-U and then separate word

16   J-I-N is John Doe 1.  Okay.  Go ahead.

17           MR. SILVERMAN:  Right.  And to be clear, I'm using

18   the name because it's already been in all of these public

19   filings.  We're not in any way suggesting that what happened

20   here is okay.  It's obviously quite terrible.  But in terms of

21   what he knew in advance, what I see is a 2016 which is to say

22   I believe two years earlier a letter with someone who doesn't

23   look particularly vulnerable who's traveling independently in

24   the United States, that doesn't exhibit any ex-ante knowledge

25   that there would be a plan to coerce the person to come here.

1          And, of course, there's absolutely no allegation

2   that Mr. Zhu had any involvement in that part of the scheme in

3   terms of coercing the person to come here showing up at the

4   doorstep with John Doe 2.  And so we don't think that there is

5   anything in the record that would suggest that ex-ante

6   knowledge.  That's another reason that it's inappropriate to

7   apply the enhancement.

8          But, again, we think that the biggest issue is what

9   the Second Circuit in *McCall* calls the nexus and I note that

10  in probation's addendum -- I'm sorry, I don't -- I note that

11  in probation's addendum it says that the Government has

12  partially responded to the defense objections, and that

13  probation continues to support the enhancement because the

14  Government says that it can prove it.

15         But probation was implicitly conceding that what the

16  Government had provided did not fully address the defendant's

17  objections and in particular, I still don't hear any real

18  addressing of the nexus requirement or the point that the

19  victim's vulnerability -- and we don't have any reason to

20  dispute that at the time that he was brought here, without

21  Mr. Zhu's involvement, that he was sick and there was medical

22  personnel with him.  But we dispute and we believe that it's

23  sufficient to avoid application of this guideline that there's

24  any nexus between that vulnerability and his selection as a

25  victim or his vulnerability to becoming a victim.  So he's

1    not -- anyone in China could have been subject to the same

2    thing.

3              THE COURT:  All right.  Let me ask you a question,

4    though, about your argument on the timeline.

5              The Government has represented that this Exhibit

6    1020 reflects what your client sent to co-conspirator,

7    Mike McMahon in October 2016.  And in the exhibit, it says,

8    Mr. Jason Zhu, who is your client, has sent me the following

9    detailed information on John Doe 1.  And then the last entry

10   of these two pages of entries is a photo of John Doe 2 and his

11   wife and then some details about when they're leaving the

12   United States in October of 2016.  The -- you say that your

13   client's post-arrest admission about knowing that there was

14   this plan to bring the father here is all scrambled.

15             Are you saying that basically it was only in

16   October 2016 that your client learned that the father was

17   already brought to the U.S. and then was returning back to

18   China in October?  Is that what you're saying? because clearly

19   he knew something in October.

20             MR. SILVERMAN:  Yes, right.  So two things, Your

21   Honor.  First, we believe that this is actually not legally

22   relevant because of the nexus issue which we think precludes

23   the guideline regardless of this.

24             But in addition --

25             THE COURT:  When you say "nexus" --

1          MR. SILVERMAN:  There's no nexus between the

2     vulnerability and the victim's selection or the victim's

3     status or his disability did not make him particularly

4     vulnerable to the crime.  And that's citing the *McCall* case

5     because we think that China could have taken anybody from

6     China and forced them to come here, that by being an old and

7     disabled man that that did not make him particularly

8     susceptible.  But separate and apart from that, what this 2016

9     letter shows is a picture of someone who does not look

10    particularly frail and it does not describe any plan to

11    forcibly bring him here and, in fact, says that he's already

12    here and is leaving.  It describes something completely

13    different than what would happen two years later that are the

14    facts that underlie the Government's proposal for these

15    guidelines.  So what this 2016 transmission to McMahon shows

16    is that, yes, John Doe 2 is a victim of stalking but --

17    well -- but not that he is known to be vulnerable or that

18    there's any effort to take advantage of his vulnerability and,

19    in fact, based on the contents of this letter and the picture

20    in it, I think there's reason for Mr. Zhu to not believe that

21    this is a vulnerable victim.  That's not excusing the conduct

22    at all.  It's just addressing the additional two levels for

23    allegedly targeting a vulnerable victim.  But I just --

24          THE COURT:  Can I stop you for one second, though.

25          MR. SILVERMAN:  Yes, Your Honor.

1          THE COURT:  I think your argument, though -- your

2     nexus argument is a little misplaced with respect to this

3     defendant because it's easy for me to find that some members

4     of the conspiracy, namely the Chinese Government or the

5     officials in China like Ji Hu or whoever else was acting back

6     there -- J-I, H-U -- did pick the father because he's old and

7     vulnerable, and he is the father, obviously, who could have

8     more moral suasion on his son because the evidence about the

9     father's age, which we actually haven't discussed but I'm

10    going to go back to the Government on that, and his

11    infirmities would be something known to the other conspirators

12    who did pick him out of all of the millions -- billions of

13    people in China, to go to see the son.  So I think that there

14    is a nexus.

15          I think what I'm questioning, though, and what I

16    think is actually missing is that the defendant knew or should

17    have known that a victim of the offense was a vulnerable

18    victim.  So I'm focused on your client as opposed to the

19    selection of the father because that to me, I think the

20    evidence is pretty clear, that he was selected for a myriad of

21    reasons, he's the father, he is old, the travel was difficult,

22    the Chinese Government certainly knew that he had to have aids

23    or that his health was an issue.  So I don't think there's any

24    real argument that the conspirators or he was chosen for that

25    reason.  But the requirement under the guidelines as to your

1  client is that he knew or should have known.  And that's where

2  I'm thinking -- that's where I think there might be a

3  deficiency or a paucity of evidence.

4          MR. SILVERMAN:  We agree, Your Honor.  We don't see

5  the foreseeability that this was a vulnerable victim and --

6          THE COURT:  Well, this is why the timeline matters.

7  It sounds to me like your argument based in part on Exhibit

8  1020, which the Government offers is that your client didn't

9  know about the father coming until October 2016 when he was

10  leaving.  Now --

11          MR. SILVERMAN:  Well, Your Honor, to be clear,

12  that's two separate trips.  Right.  So -- but that is, as I

13  understand it, not the same trip that happened.  And I see the

14  Government nodding and they'll certainly want to correct me if

15  this is wrong.  There was a separate trip two years later

16  where he was brought here with medical personnel by the

17  Chinese Government and that's when he was brought to the

18  person's door.

19          So in 2016, it appears from this letter, that that's

20  a separate trip by John Doe 2 to the United States.  There's

21  absolutely no indication in that letter, Exhibit 1020, that it

22  was a coerced trip.  In fact, it would suggest that the

23  conspirators did not know who was taking him back to the

24  airport, one of the questions to McMahon is who's taking him

25  back to the airport, and so this is a different episode

1   entirely.

2          And so not only is it a different episode, but based

3   on what happened in this letter, the Court is absolutely

4   right, there's no ability to -- for Mr. Zhu to see that this

5   would be a vulnerable victim.  The picture that's included

6   doesn't look like a particularly vulnerable victim.  It's not

7   someone in a wheelchair.  It's not someone on a breathing

8   device or anything like that, or someone wearing an athletic

9   jacket; he's not young.

10         THE COURT:  I'm pointing to the court reporter.

11  Every time I do that, you have to slow down.

12         MR. SILVERMAN:  Oh, I apologize.  Yes, Your Honor.

13  And so --

14         THE COURT:  Let me also note that there's no

15  indication, at least in the exhibit, that your client knew the

16  father's age.  Now, I think I've read somewhere he was 80 at

17  the time he came over.  But what evidence is there that the

18  defendant -- let me turn to the Government.  And you can clear

19  up this whole timeline thing.  My memory is obviously

20  incorrect.  I only remember the father coming once.  But that

21  may be wrong.  But certainly, October 2016 was at the start of

22  what turned out to be an almost three-year effort to try to

23  get John Doe 1 to go back to China.

24         October 2016 is really towards the beginning because

25  I think it started with the defendant going to China in

1    August 2016, correct?

2            MS. CHEN:  You're correct, Your Honor, that the

3    conspiracy began in 2016.  The only incident that the

4    Government would say pre-dated that was, I believe, Jane

5    Doe 1's sister testified that someone came to her door to

6    insist that John Doe 1 return to China.  That happened earlier

7    in 2016.

8            But otherwise, you're correct, Your Honor, that the

9    timeline is that the defendant coming to the United States,

10   after having been in China and engaging Mike McMahon was

11   towards the beginning of the conspiracy.  And I think we can

12   offer some clarity as to the two incidents that we've been

13   discussing.  The first is correctly in October 2016 where John

14   Doe 2 and his wife were in the United States with John Doe 1

15   and his family.  That incident is where the defendant asked

16   Michael McMahon to essentially follow and track John Doe 2 in

17   hopes of again, finding John Doe 1 and tracking down his home

18   residence which, as the evidence has shown, it was a priority

19   for the co-conspirators.

20           Then there was the April 2017 incident which is

21   where John Doe 2 was accompanied by a doctor from China and

22   made the essentially coerced trip from China to the United

23   States.  Again, with the directive to convince John Doe 1 to

24   come back to China and otherwise, operation was to find out

25   John Doe 1's location.

1          THE COURT:  So two things, though, the first trip

2     made by the parents, it's funny, I completely forgot about

3     that one.

4          Was that in the company of Chinese officials or that

5     was just a family visit?

6          MS. CHEN:  There's no evidence that there were

7     Chinese Government officials accompanying John Doe 2 in

8     connection with the October 2016 trip.  Nevertheless, they

9     were obviously aware that he was in the United States and had

10    been tracking him otherwise, because the defendant asked

11    McMahon to attempt to surveil him at the airport to locate

12    John Doe 1.

13         THE COURT:  Right.

14         MS. CHEN:  And that's the way that John Doe 2 is

15    used in October 2016.  And certainly, that indicates that the

16    defendant was aware of John Doe 2's involvement or use to his

17    co-conspirators in the overall scheme as early as

18    October 2016.

19         THE COURT:  That, I'm not sure of.  I thought where

20    you were going to end that sentence was the relevance of this

21    exhibit is that the defendant certainly knew what John Doe 2

22    looked like, could, as you argue, assess that he's an elderly

23    man, although I have to agree with the defense on this, he

24    actually looks rather hail in this picture and he is wearing a

25    sport outdoor hiking-type jacket.  I wouldn't characterize him

1    as frail by any stretch, but he certainly does look older.

2             But the relevance of this 2016 document or

3    communication is that the defendant knew what the father

4    looked like, had some idea that he was older, and -- but the

5    part I'm disagreeing with you on is I don't think he knew that

6    they were part of any scheme by the Chinese Government to

7    convince the defendant to return -- John Doe 1 to return home.

8    But he was -- the father became part of the scheme to try to

9    locate John Doe 1 because, in fact, Mr. Zhu was saying to

10   Mike McMahon, maybe you could follow them and figure out where

11   John Doe 1 lives.

12            But then going to the second visit, April 2017, it

13   seems to me that's during the period of time when there's no

14   evidence that the defendant here was actively involved in the

15   conspiracy, because there seems to me a gap, after

16   October 2016 or so, and then the defendant reappears -- or

17   November 8th, 2016, I think, is the last reference to

18   Mr. Zhu's involvement, and then he reappears again in the

19   evidence, at least, in May of 2018.  And thereafter, he makes

20   a trip, I guess to China and he also obtains a photo of the

21   sister-in-law and her husband.

22            But it seems to me the April 2017 period is where

23   Mr. Zhu seems to be absent at least according to the evidence.

24   So what evidence do you have that he was aware, then, that the

25   father was used by Chinese Government?  Perhaps then more in a

1   vulnerable state, one could argue, because he's another six

2   months older, something that would show that he actually knew

3   that the father was a vulnerable victim chosen to perpetrate

4   the crime.

5           MS. CHEN:  Yes.  To address your first point very

6   briefly, Your Honor.  I think you are correct that the

7   Government's position is that Government's Exhibit 1020 does

8   show that the defendant knew of the defendant's -- or of John

9   Doe 2's age, rather.  Certainly, the document includes

10  John Doe 1's date of birth, and he's certainly aware that

11  John Doe 2 is John Doe 1's father.

12          THE COURT:  Wait.  So how does he know the date of

13  birth?

14          MS. CHEN:  John Doe 1's date of birth is on the

15  first page of Government exhibit. John Doe 1.

16          THE COURT:  Oh, John Doe 1.

17          MS. CHEN:  Yes, John Doe 1.  And then certainly as

18  the father, I think it's reasonable to infer that he should --

19          THE COURT:  Doing the math.

20          MS. CHEN:  Exactly.  Doing the -- understand the

21  approximate age of John Doe 2 based on that, as well as the,

22  obviously, physical picture of John Doe 2 in the exhibit, as

23  well.

24          But going to your point, Your Honor, about the

25  defendant's knowledge of the April 2017 incident, I think

1   there we would point to the post-arrest interview where

2   certainly while there's no evidence that the defendant was

3   personally involved in that operation and literally bringing

4   John Doe 2 to the United States.  In his post-arrest

5   interview, he does say that he was aware that John Doe 2 was

6   brought to the United States to convince John Doe 1 to return

7   to China.  So certainly, I think that's evidence that he was

8   in communication with his co-conspirators and understood that

9   this was part of the broader scheme, and certainly, the

10  defendant was reengaged in the conspiracy and there's evidence

11  of that, in May 2018, where he took the surveillance photos of

12  Jane Doe one's sister's home and shortly thereafter, returned

13  to China.

14          THE COURT:  And this is where you argue that the

15  defendant's post-arrest has a garbled timeline and that, in

16  fact, you're representing that -- well, that he told you or

17  that he's saying, I should say, that he didn't know

18  contemporaneous with John Doe 2 being brought to the U.S.

19  which would have been April 2017, but he learned some time

20  thereafter?

21          MR. SILVERMAN:  Yeah, I think that that's a fair

22  reading also of just the statement itself which is in the

23  record.  And there's a 55-page transcript but we agree with

24  what the Court said about knowledge as to vulnerability or

25  disability and that really makes the post-arrest statement

1   irrelevant in terms of the applicability of the guideline

2   because even if the age is known, the question is do you know

3   that this is a vulnerable person and while it's clearly not a

4   young person in the picture, it doesn't look like a sick

5   person.  I would be very -- it doesn't look, frankly, like

6   someone who's 79 years old in that pictures.  And so -- and it

7   certainly doesn't look like a vulnerable person.  In fact, the

8   contents of the letter says that the person is independently

9   traveling in the United States, which would seem to suggest

10  that the person is not vulnerable or disabled.  And so there's

11  just no evidence of ex-ante knowledge of that fact.

12          THE COURT:  All right.  So this is a close call, I

13  would say, certainly, as to this defendant.  Because again,

14  I'm focusing on what the requirement is under 3A1.1(b) and it

15  does require that the defendant knew or at least should have

16  known that the victim was vulnerable.  Obviously, the

17  definition of vulnerable is a bit illusive.  There are very

18  healthy 79-year-old and then there are very infirmed

19  79-year-old.  Age is obviously not the only consideration.

20  But I think here as to this defendant, at least, I'm not going

21  to apply the vulnerable victim enhancement.  I just don't find

22  that there's really enough to show that this defendant knew or

23  should have known that the victim was infirmed and here, of

24  course, we're talking about John Doe 2.

25          I appreciate the Government's arguments and they

1    certainly have some common sense appeal.  But I just think

2    it's really increasing the guidelines by quite a bit, two

3    levels, based on an extremely thin record as to this defendant

4    and what he knew, when.  There's obviously no evidence and

5    it's clear that he wasn't involved in the decision to bring

6    the father back the second time or I should say bring the

7    father in April of 2017 to try to coerce the son into going

8    back to China.  So I just think it would be inappropriate to

9    apply that enhancement to this defendant based on these facts.

10   So I'm not going to apply the two-level enhancement, which

11   reduces the total offense level to 23 and then the guidelines

12   range down to 46 to 57 months in Criminal History Category I.

13   As we discussed before, it doesn't affect the lack of

14   application of the Zero-Point Offender unless, Mr. Silverman,

15   you have an argument about the crimes not involving a threat

16   of harm.

17            MR. SILVERMAN:  Well, I think, Your Honor, the way

18   to analyze it, and both parties used this analysis when

19   addressing the question about multiple conspiracies, is what

20   was reasonably foreseeable as part of the conspiracy.  And I

21   assume what the Government is talking about with threats is

22   the instant with the staple gun which was at the time when

23   Mr. Zhu was not part of the conspiracy when he was certainly

24   not present, it's completely unlike the one time that he

25   accompanied these individuals --

1           THE COURT:  So we're clear you're talking about

2    using the staple gun to put a flier on the door and that's

3    later, not anyone threatening someone with a staple gun.

4           MR. SILVERMAN:  I assumed -- the Government

5    mentioned credible threats so maybe the Government -- I'm not

6    sure if I'm addressing which threat the Government thinks is

7    the credible threat that precludes the enhancement of the

8    reduction.

9           But what I'm saying is that I'm not aware of any

10   evidence that such direct threats were foreseeable within the

11   scope of what Mr. Zhu knew and so, therefore, we believe that

12   this Zero-Point Offender two-level reduction is warranted.

13          THE COURT:  Okay.  Someone can point me perhaps to

14   the Zero-Point Offender provision that we're talking about.

15   I'm guessing that it says something like the crime of

16   conviction involved the credible threat of harm.

17          I'm not -- and I know you're talking about a

18   different knowledge or foreseeability issue.  But on this one

19   I would side with the Government, that I don't think he

20   gets -- and this is the first time I think we're arguing about

21   it, the Zero-Point Offender reduction, because the crime -- I

22   think it was reasonably foreseeable to him that there would be

23   some use of coercion and harassment because -- in order to get

24   Mr. Doe 1 to return to China.

25          I think the defendant in a way is probably more

1   aware of the tactics used by the Chinese Government than

2   others, even.  So I don't think -- especially because he

3   seemed to be aware that John Doe 1 was wanted by the

4   Government for prosecution or that they wanted to do something

5   to him.  So I don't think Mr. Zhu was under any illusion that

6   they were just going to ask nicely and say, pretty, please,

7   because obviously they brought over his father to try to

8   convince him and then they tracked him down at his home and

9   there was a private investigator hired to locate him and there

10  were all of these other efforts made including getting

11  information on the sister-in-law and the inference is that

12  when Mr. Zhu did that in May of 2018, he communicated that

13  information to the Chinese Government who then started

14  flooding them with pretty hostile and threatening mailings.

15          I think some showing the family members sitting on

16  the couch looking terrified.  So I understand what you're

17  saying about foreseeability here.  But I think there's enough

18  here to find that Mr. Zhu knew or foresaw that there were

19  going to be some strong armed tactics used by the Chinese

20  Government to persuade, I would say probably coerce

21  Mr. John Doe 1 to go back and face some kind of negative

22  consequences meted out by the Chinese Government.  I don't

23  think he was naive about that.  So I think that he had a

24  pretty good idea when he was getting this information that the

25  Chinese Government was going to do whatever they could to try

1   to get Mr. John Doe back to China.

2           So I'm not going to apply the Zero-Point Offender

3   benefit.  But I have reduced the guidelines by two levels to

4   23 for Counts Three and Four.  The guidelines range is 47 to

5   57 months in Criminal History Category I.

6           MS. CHEN:  Your Honor, I think it's 46 to 57.

7           THE COURT:  What did I say?

8           MR. SILVERMAN:  43, Your Honor.

9           THE COURT:  Yup, 46.  Sorry, I misread my own notes.

10  Forty-six.

11          Now, the other argument that's been alluded to is

12  the defense objection to what it characterizes as probation

13  breaking down the stalking conspiracy charged in Count Three

14  into multiple offenses and then applying a grouping analysis

15  to arrive at a total offense level for Counts Three and Four.

16          Now, you don't cite any authority for your argument.

17  You do rely, I think, on co-conspirator McMahon's argument.

18  For what it's worth he cites the case of *Robles*, R-O-B-L-E-S,

19  562 F.3d 451, but I read that submission and the case, and I

20  think it's miscited or misapplied because *Robles* says quite

21  the contrary.  It pretty firmly stands for the proposition

22  that offenses that are alleged to be committed as part of the

23  conspiracy, though they have to be sufficiently proven to have

24  occurred, can be considered under 1B1.2(D), which is the

25  guideline provision that's being applied here by the probation

1    department.

2              I think the case law is clearly and certainly was

3    affirmed in the Fourth Circuit decision in *U.S. versus*

4    *Mitchell* just this year or last year, 2024.  That's reported

5    at 120 F.4th 1233 and, like I said, that comes out of the

6    Fourth Circuit.  And there they clearly address this issue and

7    affirmed that under guideline 1B1.2(d), a conviction on a

8    count charging a conspiracy to commit more than one offense

9    shall be treated as if the defendant had been convicted on a

10   separate count of conspiracy for each offense that the

11   defendant conspired to commit.  And they also make clear that

12   it's not necessary for the separate crimes committed as part

13   of the conspiracy to be identified in the indictment.  There

14   is, of course, the Application Note that *Robles* cited which

15   does caution the Court that there has to be sufficient

16   evidence that the criminal acts occurred but here, there is,

17   because there was a trial and I sat through the trial and I

18   can say that there's certainly enough evidence that all of the

19   acts that the guidelines calculation is based on were shown to

20   have occurred.

21             And those could each be counted as separate acts of

22   stalking for purposes of the guidelines calculation.

23             I do note that the jury obviously returned a verdict

24   against the defendant on the stalking, the substantive

25   stalking charge.  But that charge in the indictment, as I

1   recall, did not identify the specific acts or wasn't broken

2   down into separate offenses but was a course of conduct that

3   was charged substantively.  But again, having not only sat

4   through the trial but found post-trial that there was

5   sufficient evidence to show all these acts occurred, I do

6   think that there's enough to apply 1B1.2(d) and count each of

7   these acts that were carried out as part of the conspiracy as

8   separate offenses and then have them grouped together for the

9   guidelines calculation.

10          I don't think you need to be heard further on that,

11  Mr. Silverman.  So let's move on to the next one.

12          MS. CHEN:  Your Honor, I'm sorry to interrupt.

13          THE COURT:  Oh, yes, please.

14          MS. CHEN:  Just before we move one from this

15  particular guideline, I would nest that in Application Note

16  Four, there is the heightened standard that the Court must

17  find beyond a reasonable doubt with respect to what Your Honor

18  was just talking about.  I just want to clarify that that is,

19  in fact, the standard of which the Court is using.

20          THE COURT:  Yes.  I appreciate that, actually.  I do

21  find beyond a reasonable doubt.  And again, I've had the

22  benefit of hearing all of the evidence and then ruling on it

23  even post-trial.  Obviously, we don't know exactly what the

24  jury found beyond a reasonable doubt other than that the

25  stalking charge was proved, but they didn't make findings as a

1    separate acts.  But I do find beyond a reasonable doubt that

2    all of those separate offenses or instances of stalking were

3    actually proved beyond a reasonable doubt.  Okay.  Thank you.

4              Now, turning to the pattern enhancement that was

5    applied under guideline 2A6.2(b)(1) capital E, so small B

6    capital E.  The defense objects to that enhancement which

7    applies if the offense involved a pattern of activity

8    involving stalking, threatening, harassing, or assaulting the

9    same victim.  And the argument the defense makes is that the

10   presentence report doesn't state multiple instances of the

11   defendant going to the victim's home.  I'm going to just

12   dispense with this argument or resolve it without hearing more

13   about it.  I think that argument does miss the point.  The

14   enhancement doesn't require the defendant himself to have been

15   the one who went to the victim's home and did the physical

16   stalking.  Rather, the stalking offense had to quote, unquote,

17   "involve" such a pattern of activity.  And as the Government

18   details on Page 13 of their sentencing letter, the evidence

19   in this case clearly establishes a pattern of stalking

20   activity and, in fact, I just found beyond a reasonable doubt

21   that that is the case.  And that the stalking activity was all

22   directed at John Doe 1 and Jane Does 1 and 2 over the course

23   of three years as part of a -- and I'm quoting the Government

24   -- "multipronged, multi-phased scheme to locate and compel

25   John Doe 1 and Jane Doe 1 to return to the PRC" or the

1    People's Republic of China.  So I'm not accepting that

2    objection.  The pattern enhancement will still apply.

3            And then finally, the denial of the acceptance of

4    responsibility points.  Mr. Silverman, you've raised an

5    objection based on the fact that even though the defendant

6    went to trial and put the Government to its proof, he did

7    admit before or at the time of his arrest, I should say, to

8    doing things at the behest of the officials of the PRC

9    Government and feeling bad about that because he knows its

10   illegal.  I'm quoting roughly, from your submission.  And then

11   you also point out that he made, I think, a fuller confession

12   at the time of his probation department interview.  Oh, sorry,

13   that's what you said about his probation department interview.

14   At the time he was arrested, he told the agents that he knew

15   that Ji Hu worked for the Chinese Government -- yeah, I think

16   that's all he said roughly.

17           So you can argue this more, but I'm not going to

18   grant him the two-level reduction, and I can explain why.  But

19   feel free to argue further, if you'd like.

20           MR. SILVERMAN:  We rest on our papers on this point,

21   Your Honor.

22           THE COURT:  Okay.  So the situation that the

23   defendant is in is almost precisely the one described in

24   Application Note 2 to section 3E1.1, where it indicates that

25   the two-level reduction should not be applied.  So Application

1   Note 2 makes clear that the -- and I'm quoting, "The

2   adjustment is not intended to apply to a defendant who puts

3   the Government to its burden of proof at trial by denying the

4   essential factual element of guilt is convicted and only then

5   admits guilt and expresses remorse," end quote.

6            And this is precisely what Mr. Zhu did, in part.  I

7   think the fact that he initially acknowledged that he knew

8   that Hu Ji worked for the Chinese Government was negated by

9   his subsequent decision to go to trial and put the Government

10  to its proof.  I'll also note that the exceptions discussed in

11  Application Note 2, for example, a defendant going to trial

12  simply to preserve an issue not related to factual guilt such

13  as a Constitutional challenge to the statute or to the

14  applicability of the statute to the defendant's conduct, do

15  not apply here.

16           Now, I know you've argued that the defendant

17  actually did not want to go to trial, but that his lawyer

18  incompetently did so on his behalf.  You are front and center

19  arguing ineffective assistance.  I recognize that.  It was,

20  and I'll acknowledge, an issue that came up during the trial

21  itself and led to your appointment post-trial, Mr. Silverman.

22  But that's not something that I can consider in this

23  proceeding and certainly not without the benefit of Mr. Tung,

24  T-U-N-G, the former counsel's account.  But I do want to ask

25  you a question, and I don't want to go too far down this road.

1          But when you said the defendant wanted to plead

2     guilty, are you saying he would have admitted to both the

3     Section 951 and the stalking crimes?  And if you don't want to

4     say that --

5          MR. SILVERMAN:  Your Honor, to answer the

6     question -- I mean, just to answer the question directly, I

7     don't think this is privileged, there was a plea offer on the

8     table.  And, you know, I will say and I -- we acknowledge in

9     our letter that this is not the time to adjudicate 2255

10    matters.  You know, I think that he was not professionally

11    advised.  I think he wanted to accept responsibility.  I think

12    that he would have if he had been competently represented.  We

13    appreciate the Court's ruling on how that does or does not

14    impact the guidelines -- I'm sorry.

15         We appreciate the Court's ruling on how that does or

16    does not affect the guidelines, but, you know, I think that

17    this would have been very different if he had been represented

18    differently from the beginning for a number of reasons,

19    including other matters that are not in the record and which I

20    won't raise unless the Court wants to further inquire.

21         THE COURT:  That's fine.  I probably shouldn't have

22    asked that question.

23         You do acknowledge that I cannot address the -- what

24    is an ineffective assistance argument right now in this

25    context.  So I am going to deny the objection about the

1    acceptance points not being granted to Mr. Zhu.  Here's what

2    we are going to do for the sake of our interpreter and our

3    court reporter.  I'm going to address one more objection, the

4    minor role adjustment that's been raised, and then we'll take

5    a break.

6            You've argued, Mr. Silverman, for a minor role

7    adjustment.  We've all assumed you mean the two-level minor

8    role adjustment based on what you say is Mr. Zhu's lack of

9    knowledge or understanding of the scope and structure of the

10   enterprise and the activities of others in the conspiracy.

11   The conspiracy did last for a little over three years from

12   September 2016 to December 2019.  And as the Government

13   describes, it was multi-phased and multipronged, and as the

14   evidence showed, involved different players who didn't -- or

15   conspirators who didn't interact with each other.  But there

16   was certainly a hub in this enterprise or in this conspiracy

17   which emanated out of the Chinese Government.

18           I'm going to deny this, largely for the reason that

19   the Government has argued.  But that doesn't mean you cannot

20   argue that I think more appropriately as a basis for a

21   downward variance based on what Mr. Zhu knew or intended or

22   whether he was naive in some way about the full scope of what

23   was happening and the harm he was causing.  That's an argument

24   you can make after the break.

25           But I think it's a technical matter.  I can't give

1   him a minor role reduction because he played a pivotal role in

2   both conspiracies, the stalking and the 951, because he was

3   the connection between the Chinese Government, the Chinese

4   agents, and the U.S. co-conspirators like Mr. McMahon, who

5   carried out some of the stalking activity.  The defendant

6   traveled to China as part of the conspiracy multiple times and

7   met with the Chinese Government agents.  The defendant also

8   strategized about locating John Doe 1's address, which was in

9   Exhibit 1025 that we just discussed, or is it 1020?

10          MS. CHEN:  1020.

11          THE COURT:  1020 which we just discussed a moment

12   ago.

13          And so his role was not substantially less than both

14   of his co-conspirators.  It was just different.  And it was

15   quite important and one only that he could fulfill.  Arguably,

16   his role might have been more important and indispensable or

17   irreplaceable because he was the Chinese speaker, the Chinese

18   citizen who, as the Government points out, could travel easily

19   back and forth to meet with the Chinese agents.

20          You seem like you want to say something.

21          MR. SILVERMAN:  Your Honor, I'll just put on the

22   record, because this is responding to what the Court just said

23   and also the argument in the Government's letter.  And the

24   Court is right, we did ask for a two-level reduction, not the

25   four-level reduction.  What has just been described relates to

1    the FARA offenses for which no guidelines are calculated.  But

2    for the stalking offenses the question is what is the role

3    with respect to co-conspirators and with respect to an

4    ordinary stalker.

5              And I understand everything the Court has said about

6    arguments for a variance and the guidelines overstating a

7    particular defendant's involvement in a certain offense.  But

8    certainly, the standard person to whom the stalking guidelines

9    are applied is the person who put the stalking into effect,

10   who created the stalking.  And this is not a person -- Mr. Zhu

11   is not a person who created what was at play here.  And that

12   puts him in a very different position than your average person

13   who is convicted of stalking.

14             And so we think if you looked at him compared to

15   your average stalker who personally decides that the stalking

16   will occur, makes that decision, puts it into effect

17   personally, has multiple interactions with a victim, in that

18   comparison, that this is a reduced role from a typical

19   stalking case, and then with respect to what we agree is a

20   but-for part of the conspiracy, as we point out in our papers,

21   you know, a courier, an internal courier is a but-for part of

22   that conspiracy.  We think that the Government correctly -- I

23   think it's at Page 21 or 22 of the letter describes the

24   Chinese Government as recruiting people like Mr. Zhu.  And so

25   even within the scope of FARA, we think that that does speak

1    to role, and we certainly intend to address that as a 3553(a)

2    factor.

3              But both in terms of comparison with other people

4    who are stalkers, and we're really talking about the stalking

5    guidelines for Counts Three and Four when we're talking about

6    the minor role reduction, not the FARA, and if you look within

7    the role of the conspiracy, we do think it's appropriate, so I

8    appreciate the chance to put that on the record.

9              Thank you, Your Honor.

10             THE COURT:  Okay.  I appreciate your thoughts, but

11   on this one, I strongly disagree with you.

12             I think with respect to the stalking, Mr. Zhu played

13   a pivotal vital role.  He physically didn't go to the home or

14   look for the people or surveil them, but he provided the

15   necessary information and direction on what to do.  He gave

16   the biographical data that -- I don't know if it's a Social

17   Security number or a Chinese identification number, but he

18   provided the information that set forth, actually, in 1020, so

19   that other members of the conspiracy could carry out the

20   stalking.  They had different roles, yes.  One was at the

21   brain stem, if you will.  I realized there was someone behind

22   him.  But he was the one actually providing the vital

23   information.  So it's different than but-for.  Well, maybe --

24   it's actually but-for is not a good analogy here because in

25   theory everybody is a but-for cause of a conspiracy being

1    executed.  But you're arguing, I guess, that he's fungible,

2    the Chinese Government could have picked anybody.  But they

3    didn't pick anybody, they picked him.  He agreed to do it.

4    The question is what did he agree to do and what did he

5    actually do to further this conspiracy?  And he did as much as

6    everybody else, if not a more important role.

7           So let me just not focus on what I said -- or let me

8    not emphasize what I said before.  Just taking what he did, he

9    played an equally valuable role as maybe a better way of

10   saying it as the other conspirators, he just played a

11   different role.  But he gave them the information they needed

12   to do the stalking and he also conveyed to them who they

13   needed to stalk and that they needed to do it.  So in some

14   ways, he gave the commands or conveyed the commands.

15   Admittedly, he was a messenger and not the architect.

16          But for all the reasons that I've discussed, I'm not

17   going to give him a minor role reduction.  As you correctly

18   point out, this relates only to Counts Three and Four, and you

19   can argue under the sentencing factors that I should consider

20   the role that he did play in this overall much broader scheme,

21   akin to a drug courier in a large or vast drug trafficking or

22   smuggling operation.

23          Okay.  As promised, everyone, let's take a break.

24   Come back at -- how much time do you want?  Every 15 or 10?

25          MR. SILVERMAN:  Ten is fine.

1          THE COURT:  Ten is fine?  How are you doing, Ms. Wu?

2     Ten minutes is okay?

3          THE INTERPRETER:  I'm fine with that.

4          THE COURT:  Okay.  Let's come back at 20 of 12:00.

5     Thanks, everyone.

6               (A recess was taken.)

7          THE COURT:  Okay.  So let's go back on the record,

8     everybody.

9          Let me just recap, then, the total offense level is

10    23 for Counts One and -- sorry, Three and Four, and a

11    guidelines range of 46 to 57 in Criminal History Category I

12    applies as my starting point for those counts, and then the

13    guidelines factors under 3553(a) governed for Counts One and

14    Two.

15         All right.  Are any other unresolved objections to

16    the presentence report or addendum that I need to address,

17    Mr. Silverman?

18         MR. SILVERMAN:  No, Your Honor.  Thank you.  No,

19    Your Honor.  I would just note -- no, there are no unresolved

20    objections.

21         THE COURT:  I'll note, and obviously the parties are

22    aware, that there were a lot of objections to factual

23    statements in the objections that were filed with the

24    probation department.  Hold on one second.  Hold on, folks.

25    I'm just trying to get back up on the real time.

1          But it does seem like the probation department did a

2     yeoman's job addressing all of them.  So I think they seem to

3     have been largely resolved.

4          Okay.  So I'm going to adopt the presentence report

5     and addendum with the exception of that one change regarding

6     the vulnerable victim enhancement, okay.

7          MR. SILVERMAN:  Thank you, Your Honor.

8          THE COURT:  All right.  So now let's turn to the

9     3553(a) factors.

10          Mr. Silverman, I'm assuming you want to be heard

11     beyond your written submission; is that right?

12          MR. SILVERMAN:  Thank you, Your Honor.  Yes.

13          THE COURT:  Okay.  Let me just say this, and I'm

14     sure you already have this in mind, you don't need to repeat

15     everything in your sentencing submission, but emphasize

16     whatever you think is most important.

17          MR. SILVERMAN:  Thank you, Your Honor.  And Mr. Zhu

18     himself would like to speak --

19          THE COURT:  Of course.

20          MR. SILVERMAN:  -- and address, in particular, how

21     sorry he felt for the victims when he read the statements in

22     the PSR that they made.  It's possible after a trial to show

23     remorse without accepting responsibility, but he has both

24     showed remorse and accepted responsibility.  That is not

25     without consequence.  And it's unusual and we think it's

1  noteworthy.  He acknowledges everything that he did, that it

2  was harmful and that it was wrong.

3          He faces very substantial punishments beyond

4  incarceration.  The Government -- I just want to address some

5  points they make in their letter.  They say that the Second

6  Circuit discourages considering deportation.  We don't think

7  that -- we think that would be a legal error to agree with

8  that.  That's citing *Duke* which is a summary order from

9  before.  *Booker*, it's about departures from the guidelines not

10  the 3553(a) factors.

11          We cite Supreme Court cases, that deportation is

12  punishment, and the collateral consequences here are not just

13  deportation.  They're really quite substantial.  He won't be

14  able to live with his son.  He won't be able to see his

15  grandchildren.  We used the analogy to the Tang dynasty poem

16  that they won't even be looking at the same moon, they won't

17  be really in the same world anymore.  He'll lose his Social

18  Security, Social Security is discontinued.  He'll lose his

19  Medicare when he's at the age of becoming a heavy Medicare

20  consumer.  And these older cases that the Government raises

21  the disparity between citizen and non-citizen sentences and

22  white-collar cases and this will count by BOP computation as a

23  white-collar case, was not nearly as significant.

24          The First Step Act makes it difficult to figure out

25  how much a citizen white-collar defendant, like one of the

1    codefendants here, will spend in jail.  But -- and it depends

2    on the person, and it's really hard to figure out.  But

3    60 percent is not a frivolous guess versus 85 percent.  So

4    that's 25 percent of the sentence imposed, but it's actually a

5    41 percent increase in the amount of time that Mr. Zhu will

6    serve on the same sentence, if the same sentence were imposed

7    on him and Mr. McMahon.  And we don't think that would be

8    appropriate for other reasons but just in terms of putting

9    like in like, the difference in the contemporary world and

10   it's very offender -- offender-specific, and BOP has not made

11   it easy to figure out with a simple formula how this operates.

12   But the difference is really quite significant and we think

13   that that's important.  But this is someone who will face very

14   significant punishments beyond whatever term of incarceration

15   is imposed, and those punishments go a long way towards

16   general deterrence.

17          We also note that he was on home confinement for 15

18   months.  He lives in his son's basement.  I don't believe that

19   one of the other codefendants was on home confinement at all.

20   It's hard for me to tell from the public docket sheet, the

21   bond terms.  But that does not appear to have been the case.

22   That's a significant amount of punishment.  Certainly, COVID

23   made everything last longer.  But this case and the pretrial

24   restrictions have been going on for quite a long time already

25   and we ask the Court to take that into effect.

1                I do think at the risk of running into something the

2      Court might disagree with, I do think that it needs to be said

3      that the state of mind here, the culpability, the

4      blameworthiness is different from a lot of stalking cases

5      where there's this obsessive quality of personally trying to

6      torture and destroy the life of former intimate partner or

7      something like that.  And that's just entirely absent here.

8      And that doesn't make it fine conduct at all.  But that's a

9      level of aggravatedness that we think is factored into the

10     stalking guidelines that does not exist here at all.

11               And we also think that it's relevant that Mr. Zhu,

12     as the Court said, is fungible.  We said he was disposable and

13     disposed of.  You know, he's a pawn.  That's certainly not an

14     unusual kind of defendant.  But we think that that's something

15     to be kept in mind here.  The man's been a pawn his whole

16     life.  He's been at, you know, the whirlwinds of his country

17     of origin's politics his entire life.

18               And one thing I want to address, it wasn't in the

19     Government's letter, but I saw it came up at the trial, that

20     he goes to Wuhan and he takes pictures with the mayor of

21     Wuhan, things like that.  I think it's very important to note

22     that from his perspective that has nothing to do with showing

23     support from the Communist parties.  Like, he goes back to

24     Wuhan and he sees a city that was in deep third-world poverty

25     when he was a child, now as a modern metropolis.  And the

mayors -- you know, I think 10 percent of -- I see different

estimates on the number of members of the Chinese Communist

Party, is it 80 million people or is it 90 million people,

right?  It is not confined to a small group of people in

Beijing.  And so when he goes back to China and sees, you

know, there's a convention with hundreds of people, older

people from around the world returning to Wuhan and feted by

the local Government, I really don't think that that alone

indicates desire to support authoritarian goals abroad.

He was recruited under false pretenses.  By the time

it was going on, he knew what was happening, but we think that

it's noteworthy that he was recruited under false pretenses.

And, in fact, just last night, I was going through WeChat,

WeChat being the Chinese equivalent of both Facebook and

Twitter and Instagram and you name it, it's a whole universe

of information.  If you look at John Doe 1, the universe of

information is that this is a -- I won't even say it.  I don't

want us to be -- thought to be disparaging someone.  But the

information universe is entirely different.  And I think that

it is just a reality that even people who are skeptical of the

PRC and the CCP who live in that information universe live in

a different information universe than we do.  And that it

affects how people perceive things.  And I think that that's

increasingly a reality of the world.

But this is the information universe of pretty much

1   all native mainland Chinese readers and Mandarin speakers.

2   And it's in many ways, an alternate reality to what the

3   Government would portray here.  But that's the information

4   universe that a lot of people live in in Sunset Park in

5   Elmhurst and Flushing, and that is part of the reality of the

6   backdrop here to the involvement.  But there's no question

7   that he knew that when Hu -- Mr. Hu, H-U, was here, that he

8   was a Chinese Government official, I think Government official

9   said that he was here essentially as a junket, and that got

10  translated, he volunteered that information to the FBI when he

11  was arrested.

12          I don't think the need for specific deterrence are

13  as strong as for most people who put the Government to its

14  proof at trial for reasons that we've raised which is that I

15  do believe he was not well counseled and did not understand

16  certain things.  There will be a time and a place when there's

17  a record of that, and it's much more extensive than what we've

18  put in the record here.  But I think that it's clear that he

19  confessed when he was arrested.  He confessed again.  He

20  immediately, following trial, authorized counsel to

21  acknowledge his guilt in a written submission, and he will

22  speak to the Court today.  And he also wrote a letter to the

23  Court attached to our January 3 filing.  And that we think

24  goes to specific deterrence.

25          Ultimately, we have an aging person.  The cases that

the Government cites about medical stuff all pre-date the

Inspector General's report that we quote about the inability

of BOP effectively to manage aging inmates.  The time that he

spends in jail will be more difficult.  He'll obviously be at

a higher security designation than he would otherwise qualify

for, but it'll also just be more difficult.  The examples that

we used repeat just one thing in a sense.  It might -- but I

think it's significant is that you never know when you're bunk

mate is not going to let you take the bottom bunk, right?  And

for older people, these kinds of small things in jail become

really quite agonizing, and it makes each day much harder than

it otherwise would be.

          I was -- I was moved by his family's letters.  I

think that they show a person who is a true first-time

offender, something that is not computed into the guidelines,

and so which we ask the Court to take into account as a

3553(a) matter, and we think that a period of over one year in

prison we ask for 18 months, coupled with all of the very

significant collateral consequences, will serve very

substantial general deterrence and will punish the conduct

here.

          And unless the Court has any more questions, we'll

otherwise rest on our papers.

          THE COURT:  I do have one question for you.

          The Government raises a concern with respect to

1    recidivism and the potential for that that if Mr. Zhu is

2    deported which seems to be all but certain, and has to live in

3    China under difficult circumstances that you mentioned, for

4    example, not having the benefit of his Social Security or

5    Medicare, and I would also add, perhaps facing some potential

6    retribution from the Government, based on his admission about

7    his own wrongdoing at their request.

8            What assurance can I have that he won't resort to

9    working for the Government again in some similar capacity in

10   order to, as he did here, make some money? because then his

11   financial circumstances will probably be more dire.

12           MR. SILVERMAN:  Well, Your Honor, I think the

13   Court's first point about how he may be on the outs with the

14   Government would preclude that.  And I think that the

15   example -- this is not a man who knows how to type.  So the

16   example that the Government uses in footnote 11 of its letter

17   of a younger codefendant using a computer, I don't -- I

18   honestly don't understand -- I don't believe Mr. Zhu has the

19   capability to do that.  His English language skills are de

20   minimis, and certainly, there's no need to use him based on

21   knowledge of English, which is -- which is pretty limited.

22           So I don't really know what usefulness he would

23   have, even if people wanted to use him.  His usefulness to

24   them here was that he was able to be physically in the United

25   States.  And as the Court said it, he conveyed information.

1    In fact, that's one very subtle but I think important

2    difference on how the Government and the defense presents

3    certain information.

4            The Government's letter describes Mr. Zhu as, quote,

5    gave him directions, referring to Mr. McMahon.  And we would

6    describe that as relayed directions.  And while that's very

7    subtle, I think it's significant because it shows who's

8    creating the instructions and what the person's role is and

9    what their usefulness is, and I don't see him having any

10   usefulness at all.  I think he will be disposed of and simply

11   without use.

12           THE COURT:  All right.  Thank you very much,

13   Mr. Silverman.

14           I'll hear from the Government if you'd like to be

15   heard further beyond your written submission.

16           MS. CHEN:  Of course, Your Honor.

17           I just want to make sure that the defendant has an

18   opportunity to speak, as well.

19           THE COURT:  Yeah, I usually have him go last.

20           MS. CHEN:  Understood, Your Honor.

21           So I just want to address a couple of points.  I'm

22   not going to reiterate everything that's in the Government's

23   submission.  But I do want to touch upon some things not

24   addressed in the 3553 factors first starting with the

25   defendant's history and background.  And certainly, in the

1    defendant's submission, there's a lot of discussion about the

2    defendant's history in China and his experience and the

3    cultural evolution and otherwise.  And while the defendant

4    argue that this requires leniency from the Court, the

5    Government would argue that this actually informed the

6    defendant's knowledge of what the Chinese Government was

7    capable of and the far reaches of how -- truly how far the

8    Chinese Government would go and the harm that they would

9    instill on their own people and others.

10           And for that reason, Your Honor, the defendant in

11   some ways is more culpable because he understood and had

12   first-hand experience as to the dangers and the harms that

13   could ultimately befall the victims in this case, whom he and

14   his co-conspirators were engaged in threatening, stalking, and

15   intimidating for years and years.  So that's one point I

16   wanted to raise, Your Honor.

17           I think the other is that in this particular case,

18   the defendant was in a very unique situation to give the

19   Chinese Government a foothold in the United States, given his

20   ability to be here physically, as well as he does have some

21   English skills and some contacts certainly in the Eastern

22   District of New York and the ability to reach out to a

23   translator to ultimately hire Codefendant Michael McMahon,

24   reach out to an attorney who actually testified at trial.

25   Those are contacts that he had and he very much engaged in and

1   used that the Chinese Government wanted and he agreed to

2   provide.  And so I think it's really understating the

3   defendant's abilities when the defense says that he's a man

4   who does not know how to type.  We saw WeChat communications

5   between him and the translator he engaged in.  I think it

6   severely undercuts the defendant's conduct and his abilities

7   in this case.

8            I want to touch briefly also on the collateral

9   consequences that were raised.  And I think really the

10  argument there kind of forgets the heart of the crime of what

11  the defendant engaged in, both in the 951 charges in Count One

12  and Two, as well as Counts Three and Four in the stalking

13  charges that he's going to lose his Social Security and that

14  he's going to be removed from the United States is frankly a

15  natural consequence of engaging as an agent without

16  registering in the United States on behalf of the Chinese

17  Government here.  That he seeks now to maintain benefits

18  provided by his status here and the United States Government

19  while at the same time being convicted of these particular

20  crimes is something Your Honor should not quite take

21  seriously.

22           I also want to raise, Your Honor, of course, the

23  defendant's age is what it is.  He's 68 years old now.  But

24  this is not a situation where the defendant's being convicted

25  of crimes that he committed in his youth.  He committed these

1    crimes when he was 59 through 61 years old.  He was already an

2    experienced individual.  He knew kind of what he was getting

3    himself into in the grand scheme, given his experience in

4    China and his time living in the United States.  He had

5    developed a certain life here that allowed him to engage in

6    the conduct that he did engage in.  And so while certainly

7    incarceration could be more difficult, it's not the situation

8    where the imprisonment is for a crime that is so divorced from

9    the person who committed it.  He is very much the same person

10   who had the same conditions who was about the same age when he

11   committed the crime.  It's a little bit different in that

12   sense when we're talking often about other defendants who are

13   70s, 80s who are being held accountable for crimes committed

14   in their youth.

15          I also want to talk a little bit about deterrence,

16   both general and specific, as well as respect for the law,

17   which, of course, the Court should be considering under 3553.

18   And I think with respect to general deterrence, the Government

19   has a very different view as to who that particular factor is

20   pointed at.  And, for example, the defense raises that on

21   WeChat, it's a different world where there's different

22   information and individuals in Sunset Park and other immigrant

23   communities within this district have access to that

24   information.  I think that's entirely correct, Your Honor.

25   And that's precisely the target audience for general

1   deterrence.

2          As we've seen, during the course of this conspiracy,

3   the Chinese Government and those similarly situated in China

4   often are trying to engage those who are in the United States

5   to commit this scheme.  And they need that buy-in, they need

6   that agreement from those in the United States to commit these

7   harms, and that's very much what the defendant did here.  And

8   it is those people that the Court should be considering when

9   we're talking about general deterrence.  It is those people

10  who may be reached out to or recruited as the defense says,

11  who will need to think about whether or not they want to

12  engage with the Chinese Government, and a serious sentence

13  here will show that that is important and that there will be

14  consequences and they are not quote, "minor roles or cogs or

15  just pawns," that they very much have a choice to make to

16  engage in this type of conspiracy and to agree to act on the

17  Chinese Government.  And without that, I think, Your Honor,

18  those similarly situated may very well believe in very similar

19  terms that they are just a small piece of the puzzle and they

20  are not important in the grand scheme and that there will not

21  be serious consequences for their actions.

22          I also want to touch very briefly on specific

23  deterrence.  Your Honor raised a good point with respect to

24  him, the defendant, going back to China.  But I will also note

25  that while certainly the Government's not in a place to

1   contest the defendant's remorse, there are a number of

2   instances in the defense submission where the defendant is

3   referred to as a cog or a pawn or merely going through the

4   motions.  And frankly, with respect to the evidence and what

5   the defendant did in this case, it's the Government's position

6   that that is seriously undermining his state of mind and his

7   understanding as to what he was doing and his role in the

8   larger conspiracy.  And again, for that reason, too, Your

9   Honor, the Government would argue that a serious sentence is

10  appropriate here.

11          And lastly, I want to talk a little bit about the

12  nature of the offense here, both for Counts One and Two, as

13  well as for Counts Three and Four.  Frankly, I think the

14  defendant's conduct in this case can be characterized as

15  egregious and the conspiracy itself is also, frankly,

16  egregious.  But as the Court put it in the post-trial

17  decision, the defendant here acted as a catalyst for the

18  scheme and the campaign to harass the victims and their

19  family, beginning in 2016 from August where he came back from

20  China and was tasked with engaging a private investigator

21  which he did, signed a retainer on behalf of PRC Government

22  officials, he provided Social Security, driver's license

23  numbers, extremely private information about the victims, to

24  Michael McMahon, and others in hopes of finding these

25  individuals for the Chinese Government.  He provided photos of

1    extended family of the victims, he asked for very personal

2    details that are certainly unrelated to any lawful conduct.

3    For example, Jane Doe 1's college major, her residence hall,

4    extremely personal information for certainly the daughter of

5    the purported target of that scheme.  In November 2016, he

6    facilitated in-person meetings.  He brought and helped bring

7    PRC officials such as Hu Ji to meet with codefendant Michael

8    McMahon.  And then certainly in May 2018, he himself went to

9    the home of Jane Doe 1's sister to take photos to ensure that

10   she still lived there.  Ultimately, I think it's properly

11   inferred leading to the threatening mailings and extremely

12   disturbing videos that some of which were played at trial and

13   admitted into evidence.

14          And, Your Honor, we would dispute that the

15   defendant's purported state of mind is something the Court

16   should consider in terms of providing a lenient sentence and

17   that he was recruited under false pretenses.  I think the

18   evidence plainly shows and certainly the defendant's

19   post-arrest interview evidences that he understood and

20   frankly, of the trial defendants, most obviously and most

21   plainly understood that this was part of Operation Fox Hunt

22   that he was being engaged as part of this campaign, that he

23   was engaging with Hu Ji who worked for the overseas Chinese

24   Affairs Bureau, which is certainly part of the Chinese

25   Government.  There is not a point where the defendant seized

1    his activities because he knew what was going on and

2    certainly, I think it's quite obvious from the evidence that

3    he did and the jury found so.

4           The last things I want to touch upon are the actual

5    harms caused to the victims, certainly, irreparably scarring

6    them for life.  I'm not going to reiterate everything the

7    victims testified to at trial, but certainly, John Doe 1

8    explained that he feared for the safety of his daughter and

9    his wife.  Such an inherent harm to a family who's seeking to

10   live their life here in the United States.  Jane Doe 1 closed

11   herself off to the world, in her own words, based on her fears

12   just for leaving the house and really to have her friends and

13   family harassed based as part of this campaign.  And

14   certainly, their daughter who was reporting to their -- or

15   texting their mother, her mother every day to just tell her

16   that she's okay, physically safe, is a level of mental harm

17   and true distress that because of the defendant and his

18   co-conspirators, these victims will have to live with.

19          And I just want to touch lastly on the harms caused

20   by the defendant's criminal conduct in connection with Counts

21   One and Two.  And as we've stated in our submissions,

22   certainly, the criminal acts here threatens the national

23   security of this country.  And by assisting the Chinese

24   Government by acting covertly in the U.S. on American soil,

25   that is a harm that is frankly runs extremely deep and affects

1    every one in our community.

2           And the even more so, the actions here undermine the

3    safety and security of so many citizens and residents, who

4    many of whom, in this district, come from all places in this

5    world and they're just seeking much safety and safe haven from

6    persecution, and really the defendant's criminal conduct here

7    cuts to the heart of that sense of security and the new life

8    that many people are hoping to seek here and to live here.

9           And Your Honor, for those reasons, the Government

10   would recommend a sentence at the top of the guidelines now

11   with the revised guidelines, 57 months on Counts Three and

12   Four and then concurrent sentence of 48 months on Counts One

13   and Two.

14          THE COURT:  Okay.  All right.  Thank you very much.

15          Did you want to say something else before I hear

16   from your client?

17          MR. SILVERMAN:  Thank you, Your Honor.  I want to

18   address just one very small point, and I just -- I don't want

19   the Court to think that we misstated something.  I said that

20   Mr. Zhu can't type.  I should have been clear, he can't use a

21   Romanized keyboard.  There are something called B-I-H-U-A.

22   It's a system that you can use on a phone to put together

23   components of Chinese characters to communicate in characters

24   by text message.  He's able to do that.  I have communicated

25   with him that way, and I didn't mean to suggest that he's not

1   able to do that.  He's not able to type on a keyboard is what

2   I meant.

3            THE COURT:  And he doesn't use pinyin?

4            MR. SILVERMAN:  He doesn't -- I --

5            THE COURT:  And this is a small point.  I know that

6   everything --

7            MR. SILVERMAN:  No, Your Honor.

8            THE COURT:  Okay.  All right.  Okay.

9            Mr. Zhu -- because Zhu is his last time, right?  I'm

10  just making sure.

11           MR. SILVERMAN:  Yes, Your Honor.

12           THE COURT:  Okay.  Did you want to say anything at

13  this time?  You have a right to make a statement.

14           Mostly, I have to hear the interpreter, so yeah.

15  Not that it's not important.  She has to hear him, but I have

16  to hear her.

17            THE DEFENDANT:  Honorable Judge Chen, I want to

18  take this opportunity to pray for you good health and

19  everything smooth sail.  I am Zhu Yong, male, 69 years old.  I

20  was convicted in the trial that happened last year.  I am

21  responsible, and I'm willing to plead guilty because I'm lack

22  of sufficiency in English, lack of understanding of the legal

23  knowledge, therefore, I have committed this serious mistake.

24  I hope I would get the Government's understanding.  I regret

25  it very much so now that I did not plead guilty earlier.  In

1    that case, I would get leniency from the Government.  During

2    the trial, I heard what happened to the victims and I feel

3    very sad and very -- very sad and difficult, and I felt very

4    sad about it.

5             I have been to the U.S. for 24 years.  I based on

6    the principle to be friendly to friends, working, work

7    diligently and abide by the law.  I respect the old and love

8    the young.  I live in America honestly.  I make my

9    contribution to -- silently to the American prosperity.  Yeah,

10   I make my contribution silently.

11            When I was young, I really dreamed of coming to

12   America because America is a Democratic and freedom country,

13   everyone was treated equally and everyone is respected by the

14   country.  I have been in America for more than 20 years.  I

15   have witnessed that America is the beacon of hope for freedom.

16   It's a Democratic and harmonious society.  I also feel at the

17   same time the greatness of America.  I have filled with love

18   and passion of the country, America.

19            THE COURT:  Mr. Zhu, can I pause you for one second,

20   and I'll direct this question to you, Mr. Silverman.

21            Your client is essentially reading his letter that

22   he wrote to me and that you attached to your sentencing

23   submission.  He certainly is free to do that, if he wants to.

24   But I think the time would be more profitably spent if perhaps

25   he would answer a question I have for him.  But you can direct

1  him or advise him however you want.  Because to me, the

2  critical issue in terms of an appropriate sentence is what he

3  was thinking at the time he was assisting in what he knew to

4  be an effort by China to get John Doe 1 and his wife to return

5  to China because the Government makes a strong argument that

6  Mr. Zhu, if anybody, and I alluded to this earlier, knows what

7  the Chinese Government is willing to do, and arguably, some of

8  the distasteful ways in which they try to get people in line.

9         So he wasn't ignorant in that regard and perhaps he

10 knew better than any of the American non-Chinese

11 co-conspirators.  And I am trying to reconcile that with the

12 picture you've painted, I think quite effectively of a very

13 generous and honest man.  A person who actually tries to

14 prevent people from being harmed, whether it's his family or

15 strangers, like the fruit vendor or the woman who was

16 drowning.  So I'm having trouble reconciling this without

17 hearing from him.  What did he think he was doing?  Did he

18 actually understand the harm that he was causing?  Because in

19 all that I've read, I don't understand that.

20        And not even in the letter that he provided.  You've

21 alluded to the fact that he only realized after the fact what

22 harm he was causing.  I think you said that or it wasn't until

23 he read the victims' statements that he realized how badly he

24 had harmed them.  But I just want to understand a little bit

25 better, because he expresses remorse now.  I understand that.

1    But I want to know what motivated him, and what did he think

2    he was doing?

3              MR. SILVERMAN:  So, Your Honor, two things.  One,

4    the letter and we understand we appreciate that it was trying

5    the Court's patience.  It is --

6              THE COURT:  Hang on.  Hang on.  Don't misunderstand

7    me.  He's not trying my patience.  I just don't think he needs

8    to read it into the record.  I've read it.  That's all I want

9    him to know.

10             MR. SILVERMAN:  So it is longer than what he

11   provided to the Court.

12             THE COURT:  Oh.

13             MR. SILVERMAN:  It includes additional things,

14   including apologies to the victims, and some other things that

15   he's already read.  But we appreciate the Court's -- what the

16   Court is saying.

17             I think that he certainly knew, it is correct, by

18   the time that Hu Ji was in New Jersey, that these were

19   officials from the Chinese Government.  They told him that

20   they were there, they essentially told him that this was a

21   junket, that they didn't expect anything to come of it, that

22   this person was a corrupt official from Wuhan who was wanted

23   for bribery and embezzlement, I think the number $400,000 was

24   thrown around --

25             THE COURT:  And I think you said he didn't think the

1   Chinese Government was taking it seriously because these

2   officials were just having a boondoggle.

3           MR. SILVERMAN:  That's what he thought and that's

4   what he -- and that got translated to the FBI as going through

5   the motions.

6           I think what he realized when he saw what the victim

7   said -- I don't think it was a new realization of the facts

8   but a realization of what happened to them and what they went

9   through.  And, you know, I do think that that's -- I do think

10  that that was meaningful to him.  But it wasn't -- as if to

11  say, he didn't understand that they wanted these people to

12  return, but I think it's implicit and going through the

13  motions of boondoggle that they weren't going to pull out all

14  stops, right?  If this were in China, it would have been a

15  substantially curtailed operation, right?  You know, this

16  person would just, you know, be in jail.

17          And so in terms of foreseeing -- you know, it is a

18  disagreement I have with the Government in terms of being able

19  to extrapolate from the Cultural Revolution of all things,

20  right, to what the Chinese Government was willing to do.  I

21  should really say the PRC Government was willing to do in New

22  York in 2017, I don't think that there's any clear

23  foreseeability.  I think that the allegations here surprised a

24  lot of people.  I think that -- and I -- as I acknowledged in

25  the letter, he poorly navigated a new world that's more

1    interconnected in which the emperor is not as far as the sky

2    anymore and the reach of the PRC Government to try to

3    effectuate its will in the United States appears to be greater

4    than he would have imagined when he first came here 24 years

5    ago, and so in terms of what he actually thought they would

6    do, you know, I'm sure he thought that they would communicate

7    strong words with them.  I have no reason to believe --

8              THE COURT:  But will you let him, though, speak to

9    this point?

10             MR. SILVERMAN:  I will.  I'd like to confer with

11   him --

12             THE COURT:  Okay.

13             MR. SILVERMAN:  -- first before letting him speak

14   extemporaneously.

15             (Pause in the proceedings.)

16             MR. SILVERMAN:  Your Honor, Mr. Zhu is prepared to

17   answer.

18             THE COURT:  Okay.  And I don't want to cut Mr. Zhu

19   off if he wanted to finish reading the letter, the extended

20   version or otherwise.  So he should feel free to say whatever

21   he wants to.

22             MR. SILVERMAN:  Your Honor, may I have a moment?

23             (Pause in the proceedings.)

24             MR. SILVERMAN:  Your Honor, it might be helpful if

25   the Court re-pose its question, and then Mr. Zhu would be

1    willing to respond.

2         THE COURT:  So Mr. Zhu, I would like to know what

3    you thought was going on with respect to the Chinese

4    Government trying to get the victims back to China when you

5    agreed to assist them in this effort.

6         THE DEFENDANT:  At the time they were saying that

7    all you have to do is help us to locate this person.  The

8    rest, you don't have to be involved in.

9         THE COURT:  But when -- yes, go ahead.

10        But when you knew that they were wanted in China for

11   crimes, did that change your view about what was going to

12   happen to them or what the Chinese Government was going to do

13   to make them go back?

14        THE DEFENDANT:  He did not tell me the truth.  He

15   gave me a false pretense, and he said he owed money.

16        MR. SILVERMAN:  Your Honor, can I --

17        THE COURT:  Yes, go ahead.

18        (Pause in the proceedings.)

19        MR. SILVERMAN:  Your Honor, just for the record,

20   I've asked my client to answer the question, what did he think

21   they were going to do with John Doe 1 after he arrived in

22   China.

23        (Pause in the proceedings.)

24        THE COURT:  Can I ask another question.

25        At some point, Mr. Zhu, did you believe that your

1  actions were going to result in some harm to John Doe 1 and

2  Jane Doe 1?

3          THE DEFENDANT:  After I was arrested, I realized

4  that would be the case.  But before that, I did not.

5          THE COURT:  What did you think was going to happen

6  after you gave all this information to Mike McMahon and

7  John Doe 1 was located?

8          THE DEFENDANT:  I cannot determine what they're

9  going to do.  But after I found the information, I did not

10  have contacts with them in two years.

11          MR. SILVERMAN:  Your Honor, can I propose a

12  question?

13          THE COURT:  Sure, please.

14          MR. SILVERMAN:  Did you think that they would be put

15  in jail when they returned to China?

16          THE COURT:  Meaning, John Doe?

17          MR. SILVERMAN:  Meaning John Doe.

18          THE DEFENDANT:  Based on the warrant, yes, he

19  would.

20          THE COURT:  So based on the warrant, you thought

21  that John Doe 1 was going to end up in jail if he went back to

22  China?

23          THE DEFENDANT:  Yes.

24          THE COURT:  And did you have any belief as to what

25  the Chinese Government was willing to do to get him to go back

1   to China, how far they would go?

2          THE DEFENDANT:  I did not know because I have no

3   contacts with them later.  They reach out to me.  I did not

4   reach out to them.  Later, they claimed that they would get me

5   some money, so -- yeah, I did not reach out to them.

6          MR. SILVERMAN:  Your Honor, I think --

7          THE COURT:  Yes.

8          MR. SILVERMAN:  -- if I can paraphrase.

9          What he's saying, which I think is true, is that he

10  didn't really think about what they would do --

11         THE COURT:  Or how far they would go.

12         MR. SILVERMAN:  -- or how far they would go.

13         THE COURT:  So I'll acknowledge this is very

14  unusual, but I think what often happens in these cases even

15  when there's a trial is I really never get a direct sense of

16  the defendant.  Everybody speaks about them or for them or

17  tries to characterize what they thought or what they felt or

18  why they acted a certain way.  This is helpful to me to

19  actually hear Mr. Zhu directly answer the issue that is at the

20  center of my thinking on an appropriate sentence, which is why

21  I've detoured into this inquiry.

22         But I'll let Mr. Zhu finish his statement.

23         THE DEFENDANT:  Because I have reached an old age,

24  I'm at retirement of a year, additionally, I have multiple

25  illness and psychologically I suffer from depression, I hope

1   Your Honor give me one chance to renew myself and give me an

2   opportunity to be a new person again.  Let me see my lovely

3   grandchild who grow and thrive strongly.  That's my last hope

4   of my life.  I'm getting old.  Please, Your Honor, give me a

5   chance to renew myself.  My biggest hope is before I leave

6   this world, I would have a chance to spend my later year with

7   my family and my grandchildren harmoniously and peacefully.

8            Judge Chen, I'm really sorry that I indebted to

9   everyone.  I regret it very much.

10           THE COURT:  Sorry, could you repeat that last part

11  because it got obscured by the microphone.

12            THE DEFENDANT:  I regret it very much.  I've done

13  an offense that's against the American Democracy.  The trial

14  take up everyone a lot of time.  I want to take the chance to

15  thank Your Honor, again.  I also plead to the nations, the

16  victims, and every American citizen for their forgiveness.

17           THE COURT:  All right.  Thank you very much,

18  Mr. Zhu.

19           Okay.  I have considered the relevant factors set

20  forth by congress this Title 18, United States Code, Section

21  3553(a) that includes the advisory guideline range that

22  applies to Counts Three and Four, and then otherwise, I've

23  considered those factors as to Counts One and Two to ensure

24  that I impose a sentence that is sufficient, but not greater

25  than necessary to comply with the purposes of sentencing.

1   Those purposes include the need for the sentence to reflect

2   the seriousness of the crimes committed by the defendant, to

3   promote respect for the law, to provide just punishment for

4   the offenses that the defendant committed, to deter criminal

5   conduct by Mr. Zhu, and others who would seek to engage in the

6   same type of criminal activities, and to protect the public

7   from future crime by Mr. Zhu.  I've also considered the nature

8   and circumstances of the offenses he committed, as well as,

9   his personal history and characteristics.

10          Let me discuss my consideration of those factors in

11  more detail.  First of all, regarding the seriousness of the

12  crime, working for a foreign government as an unregistered

13  agent and stalking are both extremely serious crimes.  There

14  cannot be any debate about that.  By committing the

15  Section 951 offense, the defendant helped a foreign

16  Government, the People's Republic of China conduct a campaign

17  of -- and this is using the Government's words --

18  transnational repression against two individuals living in the

19  United States and seeking refuge here, quite frankly.  And

20  that campaign included terrorizing their family members here

21  and in the PRC.

22          As the Government argues, quote, "By agreeing to

23  carry out an unsanctioned PRC operation on U.S. soil at the

24  direction of PRC Government officials, the defendant

25  threatened not only the personal safety of the victims, but

1    also, the United States sovereignty," end quote.  These types

2    of crimes are a threat to this country's national security.

3    There can be no debate about that, as well.  And as we've

4    discussed, by aiding his conspirators or co-conspirators in

5    surveilling, harassing and menacing the victims, the

6    defendant's conduct caused a second separate harm that is

7    terrorizing the victims and wreaking havoc in their lives,

8    which has permanently scarred them.  The victims in this case

9    wrote about the severe and ongoing emotional, psychological

10   and even physical harm that they have and will continue to

11   suffer as a result of the actions of the defendant and his

12   co-conspirators at the direction of the Chinese Government.

13            At a minimum, the victim's sense of well-being and

14   personal safety has been destroyed.  Which has, in turn,

15   caused serious impacts on their physical and psychological

16   health.  So there's a clear need in this case for a sentence

17   that promotes respect for the law, provides general deterrence

18   and just punishment.  These types of crimes do warrant

19   meaningful punishment for all those reasons.

20            The Government does cite, I think, appropriately,

21   the need to deter others from agreeing to engage in this crime

22   because as they note, and I've seen it myself, there is a

23   tremendous uptick in these prosecutions.  I assume it

24   corresponds to an increase in the activity, itself but that

25   just may be that the Government is now more attuned to these

1    crimes.  And by that, I mean the Section 951 crimes.  We've

2    been getting more and more of these prosecutions just as the

3    Government notes in its submission.  So it is necessary for

4    the sentence I impose on Mr. Zhu to send a clear message to

5    anyone else, who would seek to work for the Chinese Government

6    for this purpose, and not register, that there will be serious

7    consequences for doing so.

8            I have less of a concern about the need for specific

9    deterrence with respect to Mr. Zhu.  We've discussed this

10   obviously, at some length.  But he is 68 years old but maybe

11   under the Chinese system he considers himself 69.  But I

12   think -- chronologically, I think he's 68.  And he does seem

13   genuinely remorseful.  As I said a moment ago, I did engage in

14   what is somewhat an unusual exercise of posing to him the

15   question about what he was thinking because I think only he

16   can really convey that.  And I wanted to hear what he said.

17           I'll explain or discuss this more in a moment, but

18   it's been my abiding sense with Mr. Zhu even through the trial

19   and before trial, that he's not a sophisticated person, and

20   he -- and this is obviously borne out by his rather

21   unfortunate circumstances and during the Cultural Revolution

22   and being deprived of many opportunities as a result, and then

23   struggling to build a life for himself and his son here in the

24   U.S., that he isn't someone who's very worldly or understands,

25   perhaps, all the ways of the world.

1          Now, the Government makes a very good point, and

2     I've said this myself, that having been punished or retaliated

3     against by the Chinese Government or mistreated by them,

4     himself, you would think he would be very aware of what the

5     Chinese Government is capable of.  But I think the last

6     20-plus-years has perhaps imbued him with some kind of

7     optimism that has obscured or maybe dimmed his view about how

8     brutal the Chinese Government can be.  And as his lawyer just

9     explained now, perhaps he thought that here in the U.S., the

10    Chinese Government wouldn't be able to carry out some of the

11    extremely brutal actions that it has or can do or has done in

12    China.

13         So I am not as concerned that Mr. Zhu is going to

14    reoffend.  He is elderly.  His main concern, I'm sure, will be

15    to take care of himself and try to remain in contact with his

16    family should he be deported.  I did pose the possibility that

17    maybe with the lure of money he might reoffend even when he's

18    back in China, but I think Mr. Silverman's responses is

19    probably correct, there's really not much I think Mr. Zhu can

20    do for them in this area, nor do I think that the Chinese

21    Government would necessarily trust Mr. Zhu, given how he has

22    expressed remorse for the actions he's done here and admitted

23    his complicity in these actions.  And as Mr. Silverman notes

24    there are very, very many people in China that they could

25    recruit who might be far more useful to them than Mr. Zhu upon

1    his return.  So I think the risk of recidivism is low here,

2    and the sentence that I impose, I don't think needs to promote

3    or further that goal.

4           Regarding Mr. Zhu's character, the defense has

5    provided a number of letters from his friends and family

6    attesting to his good, generous and unusually, I would say,

7    honest character.  I have to admit that I was struck by the

8    number of different accounts from different people of

9    Mr. Zhu's acts of kindness, spontaneous kindness and

10   exceptional honesty.

11          For example, the stories I mentioned about going

12   back to the fruit vendor when she gave him far too much

13   change, or trying to save the drowning woman when Mr. Zhu

14   himself apparently cannot swim.  These letters definitely, as

15   I said before, paint a picture of someone who really has

16   always gone out of his way, certainly long before he got

17   arrested, and had a reason to try to put himself in the best

18   light, to help other people, and that he's genuinely kind and

19   thoughtful towards others, even those beyond his family.

20          Now, this is very much at odds with someone who

21   would knowingly or intentionally seek to help the Chinese

22   Government harm others, to harass them, to coerce them, to

23   convince them to come back and go to jail.  This is why I find

24   that I'm in a bit of a dilemma here trying to reconcile what

25   are these two different pictures borne out by the statements

1    and evidence I have before me.  Because on the other side,

2    just as the Government argues, I think quite convincingly,

3    Mr. Zhu knew that he was helping the Chinese Government, at

4    some point tried to return someone to face prosecution and

5    imprisonment.  I don't think he denies that.  He may not have

6    known it at first, but he certainly knew it at some point

7    while he was still involved with the Chinese Government, and

8    that continued into May of 2018 at a minimum.  And he even

9    went back to China after that.  So like I said, this is a

10   conundrum for me because these acts and what they reflect

11   about his character are at odds.

12          So I come away, quite frankly, concluding and this

13   is again why I asked these questions directly of Mr. Zhu is,

14   in many ways, I think he is and was naive and to a large

15   extent, ignorant, about the harm he was causing these victims

16   by helping the Chinese Government.  He certainly knew what he

17   was doing, but he failed to appreciate, it seems to me, the

18   gravity of what he was doing and the actual harm he was

19   visiting on people that I think in another context, he might

20   actually try to save or help.  And I see that, quite honestly,

21   and this doesn't get conveyed in the cold record, from even

22   how he responds to the questions.

23          Again, I don't think and I don't mean any disrespect

24   to Mr. Zhu, he's a particularly sophisticated person.  I think

25   he sees a situation in front of him, and he doesn't really

1  think too hard or too long about the ramifications and maybe

2  that's why he acts out of kindness in a way that might danger

3  himself like trying to save a drowning person who he himself

4  might drown but also it means he tried to help a repressive

5  Government, a Government he knows is repressive, or certainly

6  has been, to try to capture, if you will, or repatriate, as

7  they say, other citizens of China, fellow citizens of China.

8          So I will also comment on the difficulty in

9  sentencing I think defendants in these types of cases, and by

10  this I mean the 951 cases.  What I mean is that the truly bad

11  actors, the Chinese Government, and its officials, and I

12  should say the PRC Government, the CCP, and its officials or

13  agents, they cannot be held accountable or punished unless

14  perhaps they make the mistake of coming back to the country

15  and the Government happens to catch them, someone like Ji Hu

16  or Hu Ji.  Rather, what we have is someone who acknowledges

17  that he did a bad thing, but yet, as I said before, really

18  fails to appreciate the scope and the gravity of his conduct

19  and the real harm that he has helped cause, certainly,

20  indirectly has caused to these victims and to this country,

21  which I think he's now fully realizing by working for the PMC.

22          So as I said before, while Mr. Zhu is not

23  sophisticated or worldly, he did knowingly and willfully

24  become part of a conspiracy that has ruined the lives of the

25  victims and their families, both here and in China.  But

1  Mr. Zhu didn't act willfully or out of any intent to harm the

2  victims.  That I'm sure of.  And I also realize willfulness is

3  not necessarily relevant, and it's certainly not required to

4  commit the crime.  But I do find that Mr. Zhu's naivety and a

5  misguided belief that this was maybe a good way to earn some

6  money and visit his family, get trips to visit his family did

7  contribute to his involvement in these offenses.

8          The characterization of Mr. Zhu as a pawn certainly

9  correct from the perspective of the Chinese Government, but as

10 Government points out, it doesn't undermine his own volition.

11 He did the act knowingly.  He knew he was helping the Chinese

12 Government do exactly what they were trying to do.  He just

13 really didn't appreciate how much harm he was causing and

14 wreaking on the victims.

15         I think it warrants some downward variance.  Maybe,

16 because as Mr. Silverman argues, stalking is typically a crime

17 where the persons involved in the stalking, even if they're

18 just conspirators, have some desire to visit harassment and

19 harm on people.  I think Mr. Zhu definitely got involved in

20 this conspiracy knowing that this would be a likely

21 consequence that these victims would be harassed, but he

22 seemed to fail to appreciate how bad that would be, and he

23 certainly, in my mind, doesn't have the kind of character

24 where he wants to harm people.  So he became -- and I don't

25 want to use the word "unwitting" because he knew what he was

1   doing -- but he became a conspirator in some very bad conduct

2   without a full appreciation of how harmful it was.

3            And he did get used by the Chinese Government,

4   there's no question, but that's how they commit these crimes,

5   of course.

6            The defendant's age and his physical and mental

7   health issues I think also warrant some consideration.  I've

8   reviewed the papers that have been submitted to me and recount

9   his various ongoing health issues and his mental health issues

10  which I think are significant.  His family is also reporting

11  increasing short-term memory loss, which is not surprising

12  given his age and includes things such as failing to turn off

13  the stove, which is obviously dangerous in the context of

14  prison, obviously, it's less significant.  But while I do find

15  that Mr. Zhu's conditions currently appear to be manageable,

16  given his age and the historical progression of his ailments,

17  as well as his overall physical and mental deterioration over

18  the last few years, I do think that jail will be especially

19  hard on him and hard for him.  I also know, based on reports

20  that we get in cases and otherwise, that medical care is often

21  wanting in the Bureau of Prisons system.  I certainly can't

22  predict with any certainty where Mr. Zhu will go or what the

23  medical care will be like, but I think it's fair to assume

24  that he will have to endure some difficulties with respect to

25  his medical situation and his mental health situation.

1              Is he all right?  Do we need a break?

2              MR. SILVERMAN:  Your Honor, may I have one moment?

3              THE COURT:  Yeah, go ahead.

4              (Pause in the proceedings.)

5              MR. SILVERMAN:  Thank you, Your Honor.  We're okay.

6              THE COURT:  And so I think this is also a basis for

7    a downward variance from the guidelines range and a

8    consideration under the 3553(a) factors.

9              The defendant's childhood and early adult life, I

10   don't think, though, warrants a downward variance.  In that

11   regard, I agree with the Government.  It doesn't explain or

12   justify why he committed the crime.  If anything, it defies

13   logic that he would want to sign up to help the Chinese

14   Government do anything or to trust them to treat him fairly

15   given the inhumane treatment he suffered at their hands

16   earlier.  So I don't think his growing up in the Cultural

17   Revolution is difficult as I know it must have been warrants a

18   downward departure.

19             I hear what you're saying, Mr. Silverman, about a

20   different viewpoint or perspective based on where someone

21   grows up and their experiences.  Here, I don't actually think

22   it is mitigating in Mr. Zhu's circumstance for that reason.  I

23   think he's more educated, as the Government notes, about the

24   brutality that the Chinese Government, again, always referring

25   to the PRC, is capable of.  So I just don't think it helps him

1    here.

2           Now, in terms of the messaging that he might

3    perceive now that he's living abroad, I don't think that

4    that's particularly relevant either, but it is relevant to the

5    sentencing that I'm going to impose in terms of general

6    deterrence, and I think that might have been some of what you

7    were alluded to.  And I'll explain that further in a moment.

8           Finally, or almost finally -- penultimately, I will

9    say -- deportation.  Ordinarily, I agree with the Government

10   that deportation is not a basis for a downward variance or a

11   departure because it is the normal and predictable consequence

12   of a felony conviction, and maybe this sounds harsh, but

13   something that a defendant ought to think about and consider

14   before choosing to engage in criminal conduct if they are a

15   resident and not a citizen of the U.S.

16          And again, the Government makes an interesting point

17   about the defendant's alienage not serving as a mitigating

18   factor because it gave him an advantage in terms of committing

19   this crime since he was able to move fluidly between China and

20   here.  I haven't really considered that for purposes of

21   sentencing.  I've obviously considered it in a different

22   context in a way.  But I do think that in this case that in

23   Mr. Zhu's case, his likely deportation is an unusually harsh

24   consequence, perhaps, even a punishment, because it will tear

25   Mr. Zhu away from his son and his family, his grandchildren,

1    and his daughter-in-law after Mr. Zhu spent the last 20-plus

2    years and hard years, I think, trying to establish a good life

3    for himself and for his son in this country.  So his

4    deportation wreaks a particularly harsh consequence for him

5    because of that separation.

6              It's somewhat akin to when children come here from

7    another country as -- or people come here as children from

8    another country and this is the only country they've ever

9    known and then they get deported because they're actually not

10   citizens.  For all practical purposes, Mr. Zhu's tried to

11   establish himself as a citizen here for many years and has

12   worked hard to do so and has tried to embrace American values,

13   notwithstanding his involvement in this crime, and now, his

14   family is here and he's going to have to be exiled or banished

15   from the place he believes is his home and his children's

16   home.  So it's different, in a way, and it's unusually harsh,

17   I think, for Mr. Zhu.

18             With regard to his pretrial and presentence release

19   conditions, I've given that some thought.  I don't think they

20   were particularly Draconian, so I don't think they're

21   necessarily worth a downward variance.

22             Lastly, I have considered the need to avoid

23   unwarranted disparities between similarly situated defendants

24   and both sides spent a fair bit of paper trying to tell me

25   about comparable cases with sentences higher than the

1    guidelines range here or lower than the guidelines range and

2    even sentences of probation on the defense side.  I find this

3    particular factor so hard to apply in any sensible way because

4    as everyone knows, sentencing is decided based on many more

5    factors -- or sentence is determined based on many more

6    factors than the crime they committed.  And usually, it's

7    things that I won't be able to learn about or read about or

8    process.  So I don't find them particularly helpful.  It's

9    many of the personal factors that go into any sentence that a

10   judge imposes, just like here.

11            I do want to address one other thing.  I think the

12   Government is right, Mr. Silverman, that even though Mr. Zhu

13   will lose his Social Security and Medicare benefits, that

14   would likely happen even if he remained in the U.S.  It has, I

15   think, nothing to do with China.  That is typically a

16   collateral consequence of committing a felony and it's not

17   something that I think warrants a variance.  It's really about

18   the separation, the forced separation from his family that I

19   think is unusual and harsh.

20            So after assessing the particular facts and

21   circumstances of this case, in light of the relevant Section

22   3553(a) factors, and the advisory guidelines range that

23   applies to two of the counts, I am sentencing the defendant to

24   24 months in custody, and that's on Counts One -- all the

25   counts, but to run concurrently with each other.

1           I know this is far below what the Government sought

2    but as I said, I think Mr. Zhu's particular circumstances and

3    history and characteristics and his involvement in this

4    crime -- and I won't call it his role because I think that's

5    different.  But really, his mindset, I think warrants a

6    departure.  I think this is a defendant who really failed to

7    understand or appreciate the gravity of what he was doing.

8           I'm mindful of the fact that this could be said in

9    other situations, but not usually, I don't think.  Typically,

10   for example, drug dealers who sell drugs knowing that they

11   know they're harming people, people who use guns know that

12   they're harming people, people who steal money from bank

13   accounts and commit fraud know they're harming people.  This

14   crime is an unusual one because it's really a foreign actor

15   getting people to do their bidding and to undermine our

16   national security and then harm individuals who are quite

17   remote, oftentimes, or at least as to Mr. Zhu, in terms of his

18   criminal conduct.

19          What I am going to mention about this is general

20   deterrence.  I know the Government is concerned about the

21   message that a 24 versus a 57-month sentence will send to

22   others who could make the same wrong decision to work for a

23   foreign Government.  I'm hopeful that maybe this case won't be

24   cited as trying to promote unwarranted disparities because I

25   think there are many factors, personal factors, that I think

1   that are at play here.  And I think Mr. Zhu's situation is not

2   even comparable to his codefendant in this case, so I don't

3   want this to be recited to me as a data point for that reason.

4          And I think it will send a message of general

5   deterrence to the target audience, which is, I think, this

6   immigrant community, because two years in prison is not a slap

7   on the wrist, in my opinion.  It's long and it'll be hard for

8   Mr. Zhu.  I quite honestly regret having to impose this

9   sentence.  But all the other sentencing factors, including the

10  seriousness of the crime and the need for general deterrence,

11  do warrant something that is meaningful, and I think 24 months

12  is.  And I don't think anyone who might be tempted to commit

13  this crime would think it's a good idea to risk it.  And like

14  I said, I think Mr. Zhu is unique, even as to his

15  co-conspirators for reasons that cut both ways.  But in terms

16  of his, let me call it, mental culpability or understanding

17  about the gravity of what he's done, I think Mr. Zhu is

18  different from even his co-conspirators.  All right.

19         I think I've spoken enough.  So as I said before,

20  it's 24 months on each count to run concurrently with each

21  other.  I will impose a term of two years of supervised

22  release even though it seems highly likely Mr. Zhu will be

23  deported upon finishing his prison term.  I will impose on the

24  supervised release, special conditions, the ones that are

25  recommended by the probation department in their sentencing

1    recommendation.  I trust, Mr. Silverman, you've reviewed the

2    details of those conditions with Mr. Zhu.

3              MR. SILVERMAN:  Yes, Your Honor.

4              THE COURT:  Okay.  I want to summarize them, but I

5    won't read the details based on your representation.  But I

6    will ask you if you object to any one of them.  First of all,

7    if Mr. Zhu is deported or excluded, he will not illegally

8    re-enter the United States.  And also, Mr. Zhu will cooperate

9    with and abide by all instructions of immigration authorities.

10   Those two conditions are imposed simply to ensure that Mr. Zhu

11   follows the law.

12             Any objection to those?

13             MR. SILVERMAN:  No, Your Honor.

14             THE COURT:  The defendant will also not associate

15   in-person, through mail, electronic mail, the internet, social

16   media, telephone, or any other means with any victim of the

17   instant offense, that obviously is to ensure that Mr. Zhu does

18   not reoffend and that the victims are not harmed any further.

19             Any objection to that?

20             MR. SILVERMAN:  No objection.

21             THE COURT:  Okay.  And then lastly, I will direct

22   that the defendant participate in a mental health treatment

23   program approved by the U.S. Probation department and then

24   there are some other conditions about that condition.  The

25   reason I'm imposing that is because if Mr. Zhu is fortunate

1    enough to be released here in the United States to serve his

2    supervised release, I think he needs to address what he has

3    acknowledged is depression and other mental health issues and

4    I want him to get whatever support he needs to be able to

5    successfully live in the community.

6                Any objection?

7                MR. SILVERMAN:  No objection.  Thank you, Your

8    Honor.

9                THE COURT:  Okay.  I am not going to impose a fine

10   on Mr.-- oh, let me also say this:  This sentence is one that

11   I would have imposed regardless of the guidelines range and my

12   resolution of all the different objections to the guidelines

13   calculation.  So that includes the objection about Mr. Zhu not

14   getting the two-level reduction for acceptance of

15   responsibility.  I have been guided foremost by the Section

16   3553(a) factors.  This is the sentence that I think is

17   appropriate for all counts for the reasons that I think I've

18   discussed at some rather exhausting length.  And so therefore,

19   this is a sentence I would give regardless of what the

20   guideline range was calculated to be or is calculated to be,

21   should there be an appeal that reverses my decisions on those

22   issues.

23                Okay.  Restitution.  Oh, sorry, let me go back to

24   the fine.  I'm not imposing a fine because I don't find that

25   Mr. Zhu has any ability to pay one.

1          Restitution hasn't been requested by any victim; is

2     that correct?

3          MS. CHEN:  That's correct, Your Honor.

4          THE COURT:  Okay.  So I'm not imposing any

5     restitution, even though ordinarily, it would be mandatory

6     under 3663(a) as to Jane Doe 1 and John Doe 1.  Maybe as to

7     Jane Doe 2 also; is that right?  In any event, to the extent,

8     it would be -- probably, it might be mandatory as to all

9     victims.

10          Special assessment.  I'm imposing $400 in total.

11     That's $100 per count of conviction.  That's due immediately.

12          Forfeiture.  I don't think the Government's seeking

13     any forfeiture, correct?

14          MS. CHEN:  No, Your Honor.

15          THE COURT:  Okay.  So no forfeiture.

16          Mr. Zhu, let me advise you about your right to

17     appeal.  You have the right to appeal your conviction and

18     sentence in this case.  Any notice of appeal must be filed

19     within 14 days of the filing of the entry of a judgment which

20     should happen in the next day or so or within 14 days of the

21     filing of a notice of appeal by the Government, if the

22     Government chooses to appeal the sentence that I just imposed.

23     If requested, the clerk will prepare and file a notice of

24     appeal on your behalf.  If you cannot afford to pay the cost

25     of an appeal or for appellate counsel, you have the right to

1    ask that the filing fee be waived for your appeal and for

2    Court-appointed counsel for your appeal, if any.

3            Do you understand your right to appeal?

4            All right.  Let's talk about --

5            MR. SILVERMAN:  Mr. Zhu is nodding, but he

6    understands.

7            THE COURT:  Yes.  So Mr. Zhu, do you understand?  I

8    prefer you verbalize that, your right to appeal.

9            MR. SILVERMAN:  Your Honor, would the Court mind

10   asking the question one more time?

11           THE COURT:  You understand your right to appeal,

12   Mr. Zhu?

13            THE DEFENDANT:  Yes.

14           THE COURT:  All right.  So let's discuss the matter

15   of surrender.

16           MR. SILVERMAN:  Thank you, Your Honor.

17           He was asking if I will be his lawyer for the

18   appeal, and I said we'll discuss later.

19           THE COURT:  Okay.  Of course.

20           Government, what's your position on remand?

21           MS. CHEN:  Can I have one moment, Your Honor?

22           THE COURT:  Yes, please.

23           (Pause in the proceedings.)

24           THE COURT:  If it's helpful to the Government, I

25   prefer to let Mr. Zhu get his affairs in order and give him a

1  reasonable time to talk with his family.  Sadly, this may be

2  the last time he gets to see them for quite some time.

3         MS. CHEN:  Yes, Your Honor.  I think the Government

4  would consent to a surrender date that's appropriate so that

5  Mr. Zhu could be designated to appropriate facility.

6         THE COURT:  Okay.  So to spare him having to go into

7  the MDC pending his permanent designation, I will have Mr. Zhu

8  surrender, allow him to surrender as directed by the -- who

9  does it, marshals or --

10         THE COURTROOM DEPUTY:  No.

11         THE COURT:  Okay.  So he'll be directed by probation

12  where he should report to begin serving his time.

13         THE COURTROOM DEPUTY:  April.

14         THE COURT:  So that will be by April 15th at 2:00

15  p.m.

16         THE COURTROOM DEPUTY:  Before.

17         THE COURT:  Before.  Before April 15th.

18         THE COURTROOM DEPUTY:  No, Your Honor.  By

19  April 15th before 2:00 p.m.

20         THE COURT:  Okay.  By April 15, before 2:00 p.m.

21  Okay.  All right.

22         Is there anything else to address in this matter?

23         MS. CHEN:  Not from the Government, Your Honor.

24         THE COURT:  Okay.

25         MR. SILVERMAN:  Your Honor, we respectfully request

1    that the Court recommend that BOP designate Mr. Zhu either to

2    FCI Otisville or in the alternative, as near as possible to

3    the New York area to facilitate family visits.

4              THE COURT:  Absolutely.

5              MR. SILVERMAN:  Okay.

6              THE COURT:  I will do that.

7              I don't know if this is possible, but something you

8    said, Mr. Silverman, caused me some concern that Mr. Zhu will

9    be designated as high security risk and placed in a facility

10   with violent defendants.

11             I mean, does anyone know whether or not that's true,

12   stalking could be categorized as a violent offense?

13             MR. SILVERMAN:  That's interesting.  So what I know

14   is that he cannot, like Mr. McMahon, be designated to a camp.

15   So for example, most white-color offenders in this district go

16   to camp Otisville, which is a very low security facility.

17   That's not allowed.  And FCI is a medium security facility.

18             THE COURT:  Okay.

19             MR. SILVERMAN:  Certainly, his immigration status

20   will allow that.

21             How BOP would otherwise score him, I have not gone

22   through their SENTRY score at this point?

23             THE COURT:  Well, I don't want to raise an issue

24   that may never come to pass.  But at this point, I will make

25   the recommendation about not Otisville, what did you request?

1    Something as close as possible, right?

2              MR. SILVERMAN:  FCI Otisville or in the alternative,

3    as near as possible to New York to facilitate family visits.

4              THE COURT:  So he can get designated to Otisville

5    even though he wouldn't be designated to the camp at

6    Otisville?

7              MR. SILVERMAN:  Right.  Because Otisville has an FCI

8    medium and a camp like Allenwood had a USP, and it has -- it

9    has multiple security facilities, as I understand it, within

10   the same compound.

11             THE COURT:  Okay.

12             MR. SILVERMAN:  That's my understanding.

13             THE COURT:  All right.  Anything else from the

14   Government?

15             MS. CHEN:  No, Your Honor.

16             THE COURT:  Thank you, everyone.  I truly appreciate

17   your advocacy.  I view this as a terribly unfortunate

18   circumstance.

19             But I do wish you good luck, Mr. Zhu, as well as

20   good wishes to your family.

21             (Judge confers with the courtroom deputy.)

22             THE COURT:  So my deputy is trying to coach me on

23   what exactly I'm supposed to say on the surrender issue

24   because it may matter.

25             Let me read over your shoulder, Fida.  I can do

1    that?

2              THE COURTROOM DEPUTY:  Yes.

3              THE COURT:  Okay.  So the defendant shall surrender

4    for service of sentence at the institution designated by the

5    Bureau of Prisons before 2:00 p.m. on April 15, 2025.

6              Okay.  All right.  Thank you, everyone.

7              MR. SILVERMAN:  Thank you, Your Honor.

8

9              (Whereupon, the matter was concluded.)

10

11                        *     *     *     *     *

12

13

14   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

15

16       s/ Avery N. Armstrong                  January 28, 2025

17        AVERY N. ARMSTRONG                     DATE

18

19

20

21

22

23

24

25