UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------x

23-CR-316(NRM)

UNITED STATES OF AMERICA,

United States Courthouse
Brooklyn, New York

-against-                        May 12, 2026
9:30 a.m.

LU JIANWANG,

Defendant.

------------------------------x

EXCERPT TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE NINA R. MORRISON
UNITED STATES DISTRICT JUDGE
BEFORE A JURY

Court Reporter:            AVERY N. ARMSTRONG, RPR, NYRCR
Phone:  718-613-2419
Fax:    718-613-2639
Email:  Aarm.edny@gmail.com

EXCERPT PROCEEDINGS                    2

AFTERNOON SESSION

(In open court; parties present.)

THE COURT:  Thank you, jurors, for your patience. We were ready to go on time but had some technical difficulties.  We have figured out a work around for it and will proceed with the government's rebuttal.  You may proceed.

MS. OKEN:  Thank you, Your Honor.  Good afternoon. First, I just want to say thank you.  You've taken time out of your lives.  You have paid close and careful attention during this trial.  It has not gone unnoticed and we are all, everyone in this courtroom, we're all very grateful for that. So thank you.

It's almost time to begin your deliberations, and because the government has the burden of proof, we have the opportunity to stand up and address some of the arguments that Mr. Carman made to you in his closing argument.  Now, first I want to begin by reminding you, the defendant has no burden. That burden is ours and that is the way it should be.  But when the defense comes up, makes arguments to you, when they suggest theories to you, you can and you should scrutinize them.

You should line them up against the evidence.  You should line them up against your common sense.  You should test them.  You've heard this before, but your common sense is one of the most powerful tools that you will bring with you

EXCERPT PROCEEDINGS                                    3

into the deliberation room.  You use it every day in your regular lives, and you should continue to use it when you're evaluating the evidence.

Don't worry, I'm not going to walk you through all the evidence again.  Ms. Rangel did it already.  With all due respect to Mr. Carman, he is a capable attorney and advocating, as he should, but in his closing argument he came up here and he made arguments to you that were not based on the evidence.  They were not consistent with the evidence, and they were not consistent with the law.  I don't think I heard a reference to a single exhibit number in the entire argument.

It was arguments designed to distract you from the proof, not to focus you on the proof.  So now it's my job to address those arguments and to focus back on the actual proof that we saw during this trial.

Now defense counsel has argued to you that the defendant was not operating under the direction or the control of the Chinese government or any Chinese government official.  Now, as a quick reminder, this is one of the elements of that foreign agent charge.  So it requires that the defendant operated either at the direction and control of a foreign government, the foreign government of China, or a government official of China.

Now, you'll hear in Judge Morrison's instructions what that element requires and what that element does not

EXCERPT PROCEEDINGS                4

require.  First, you want to know what that element does not require?  You want to know what you're not going to hear anything about in the legal instructions?  You're not going to hear anything about task versus ask.

That's not a distinction you're going to hear about in the law.  It might be a catchy slogan, but it is made up. It is not the law, ladies and gentlemen.  I expect what you will hear from Judge Morrison when she instructs you on the law is that the relationship with a foreign official doesn't even need to be like an employer's control over an employee. A lesser degree of control, even that is sufficient.  A more hands off form of direction is enough.

It doesn't matter.  You will hear if the defendant received payment, if he received compensation, and it certainly doesn't require that there was some formalized written agreement or contract because in the real world that's not how these things work.

These kinds of agreements are ones that you infer from people's words and from their actions.  Now, like I said, Judge Morrison will instruct you on these concepts.  But direction and control, it's also a common sense concept.  When you look at the evidence in this trial, it's not hard to find. Now, that's the other thing that Mr. Carman wasn't particularly careful with, and that's the evidence.  What I mean by that is the testimony and the exhibits that you saw

EXCERPT PROCEEDINGS                                    5

during this trial.

So what does that evidence show?  I don't want to repeat all of it.  But Mr. Carman still seems to have questions about what the defendant's role was in all of it.  So let's breeze through a quick timeline.  In early 2022 the defendant was in China.  He attended a provincial meeting of the political consultative conference.  That is the conference that Professor Ku described as prestigious.  It shows that you are friendly with the leadership of the province.  We saw the defendant was there in Government's Exhibit 393 and 394.

While he was there the defendant met Lin Youping.  He was an official of the United Front Work Department, the UFWD.  Their job, you heard about, is to manage overseas affairs, to find allies abroad who can help do the work of the party.  That official introduced the defendant to MPS Officer Liu Rongyan from the Ministry of Public Security, the MPS.  Again, you learned about the MPS too, the law enforcement and intelligence apparatus.

And we saw that after the defendant met Officer Liu he added her, her WeChat contact, into his phone.  We saw that in Government Exhibit 356.  After he begins working with Officer Liu, the defendant attends a launch ceremony for the operation.  We saw, if we could take a look at Government Exhibit 311-A.  We saw it in 312-A.  We saw it in 313-B.  We saw it in 388.  I could keep going, but I think you get the

EXCERPT PROCEEDINGS                                  6

idea.

Now, after the launch ceremony, the defendant flew into Queens.  He lands there on February 14, 2022.  You saw that in Government Exhibit 353-A.  You saw his boarding pass. You saw his ticketing information.  And when does he launch the station?  The very next day after he gets back.

If we could pull up Government Exhibit 326.  If we could zoom in.  This will tell you the date of the video. It's that video conference where you have the six squares on the screen.  The date on this video is the day after the defendant lands at LaGuardia Airport.  Now, while the station is open and while it's operating, you heard all about who is making the day-to-day decisions.  It is Officer Liu, directing and controlling.  I'm not going to walk you through all the WeChat messages again, about how they set up the station, about how they connected to China.  You know all that already.

I want you to focus on how they talked to Officer Liu.  We saw in Government Exhibit 503-T, Director Liu, don't worry, we will certainly cooperate with full support.  In Government Exhibit 208-T, if we could pull that up, there is a literal manual that directs how the station should operate. If we could take a very quick look at page nine.  This isn't a manual that's just about how the applicants should proceed. It's about how the stations have to run.  And, ladies and gentlemen, as a practical matter, they literally cannot

operate without taking direction from China.

Let's pull up Government Exhibit 355. In order to go through this whole process, they have to connect to China. You saw that in the 110 system. They have to follow the directions that they are given. You can see in all of the WeChat messages that are in evidence when Officer Liu makes a decision, there is no push back, there is no suggestion, there is no discussion.

And keep in mind, you heard about this in Ms. Rangel's closing, keep in mind what happened the one time they tried to make a decision without permission. When the station decided they were going to charge people $100 for their renewals without Officer Liu's approval, we saw the messages and fall out of what happened there. Government Exhibit 413-T, if we could pull that up, Lu Jianwang says on the second message of this page, the leadership is not aware but once they find out they will be furious. In Government Exhibit 412-T we saw more of the same. Government Exhibit 503-T we saw more of the same. If we could go to 503-T.

THE COURT: We're getting a little audio feedback. It's happened to me before. You knew where I was going with that.

MS. OKEN: Thank you, Your Honor. If we could go to page 7 of 503-T. Officer Liu says, they haven't reported it

EXCERPT PROCEEDINGS                    8

to the higher authorities but if the leadership finds out, there will be serious consequences.

Now, what might be the most obvious way you know this is direction and control is that it was a worldwide operation, a worldwide operation created by the MPS, the Ministry of Public Security.

It is not something the defendant came up with on his own.  It's not something he was already doing, not something he was already going to do on his own.  It is something he did because Officer Liu told him to do it.  Told him when to do it, told him where to do it, told him how to do it, and we saw in those messages told him how not to do it.  That's because the New York station had to operate the same way as all of those other stations.  Let's take a quick look at Government Exhibit 326-A.  If we could pause it here.

Now, you've seen this exhibit before.  You have Officer Liu in the top center.  You have the New York station, the defendant on the left in the top left corner.  And you have all of the other pilot stations shown on the screen. They all appear uniform.  They all appear consistent.  That doesn't happen by coincidence.  That doesn't happen by accident.  It happens because they are all following the same direction.  People all around the world don't happen to do the exact same thing in the exact same way at the exact same time.

They are all following the same direction.  How

could it possibly be, ask yourself, that an operation involved coordinating stations and agents all over the world, but somehow all of them are just acting independently.

Your common sense tells you that can't be right. The proof in this case is far more than enough to prove beyond a reasonable doubt that the defendant operated under the direction and control of the Chinese government as a Chinese government official.

Now, I want to talk for a moment about Mr. Carman's argument that this is nothing more than a paperwork crime, that it's some kind of silly or technical charge that has nothing to do with national security.  Ladies and gentlemen, the defendant is charged with acting as an unregistered foreign government agent.  He is charged with operating at the direction of a foreign government and keeping it a secret.

That is what he's charged with.  No matter how many times defense counsel tries to make this about paperwork, this is about far more than filling out a form.  But let's indulge that.  Let's talk about the paperwork.

I don't want to spend too much on it, because as you heard twice now the parties stipulated to this element. That's the S-3 stipulation.  But let's be clear.  There is not some obscure form that has to go to some hidden office.  We're talking about a letter or an email or a fax, any writing that says what you're doing and who you are doing it for.

EXCERPT PROCEEDINGS                                                  10

Any notification that says I'm setting up shop for a foreign government here in New York City.  I'm not going to the embassy, I'm not going to the consulate, the established places where people can go.

Now, you'll hear in the judge's instructions that it doesn't matter whether the defendant knew that the law required him to register as an agent.  And that's because claiming ignorance of the law is not a defense.  But regardless of that, and despite what Mr. Carman would have you believe, notification is not difficult.  It is not convoluted.  And it is certainly not something that foreign governments just forget to do.

So ask yourself, if the Chinese government was so desperate to renew people's driver's licenses, why didn't they just say so?  You know why they didn't just say so, why the defendant didn't just say so?  Because foreign governments don't raise their hand and say I'm monitoring our citizens living abroad, I'm locating dissidents.  That is not something that they do.  Now, this brings me to my next point, which is this argument you heard in opening that no good deed goes unpunished, that all the defendant ever wanted to do was help people, the idea being this police station is only about good deeds.

I think the most important thing about that argument is that you don't have to decide whether the defendant was

EXCERPT PROCEEDINGS                    11

doing a good deed.  It is not a legal defense.  It is not a defense at all to any of the charged crimes.  Now, Judge Morrison is going to instruct you on the law and you'll have those instructions with you in the deliberation room.  In those instructions, I expect you'll see the language that a foreign agent does not need to act out of any particular motive.

It does not matter if he was well intentioned or if he was ill intentioned.  It does not matter if he was trying to do good or trying to do harm.  It is not something you have to decide, meaning even if, as Mr. Carman says, all the station was ever going to be is a DMV, the defendant is still guilty of Counts 1 and Count 2.

And by the way, it is not terribly hard to understand why just renewing driver's licenses, why that is still acting illegally as an agent of a foreign government.  For decades the law has required people acting as a foreign government agent to identify themselves as foreign government agents.  That is nothing new.  We don't allow other countries, whether they are hostile or not, to open satellite government offices in our communities wherever and whenever and however they would like.

Professor Ku talked to you about that when Mr. Carman was cross-examining him.  He told you there are ways to do that.  We have embassies.  We have consulates.  You heard

EXCERPT PROCEEDINGS                                    12

about one right here in New York City.  And as Professor Ku

told you, even if they won't physically renew your driver's

license there, they'll have a process through which you can do

that.  And so we have requirements that say you are operating

outside of those channels.  You have to say so.

          And that's because even the most innocuous, the most

seemingly harmless foreign government operations like, let's

say DMV, they can quickly and quietly become a foothold, an

entry point, a gateway, or something far less harmless.

          A driver's license office can become a home base for

collecting massive amounts of personal data, like you saw in

Government Exhibit 603.  It can become over time an operation

that locates and surveils people like dissidents who have

sought refuge here, who speak out against human rights.  And

you know that that's exactly what was happening here.

Renewing driver's licenses is something the station did.

There is no dispute about that.

          But that is not all the station was designed to do.

Now, first, Professor Julian Ku sort of gave us all a quick

and dirty lesson in the Chinese government and the tactics

that it uses to monitor and suppress people who disagree with

it.

          Professor Ku talked very little about the station

itself.  That was mostly on cross-examination.  He gave you

sort of the framework, and I encourage you to take a look back

EXCERPT PROCEEDINGS                    13

at his testimony.  You can look at his report, if you would like.  It's Government Exhibit 723.  But it is a lens, a framework that all of this other evidence fits into.

By the way, as an aside, does it make any sense to you that the government of China would go all this way if all they wanted to do was renew people's driver's licenses, to launch a worldwide operation so that people can renew their driver's licenses in a place they're not even living?  It is a massive effort to solve what I think a lot of people have now called a minor inconvenience.

This is another way your common sense can come into play.  But you also saw the evidence, that it was more than that.  You saw the evidence showing that the defendant has been someone who the Chinese government can rely on to help them execute on their tactics.  Like Government Exhibit 334-T, if we could pull that up.  You've seen this a couple of times now.  This is the WeChat messages where the defendant, on his own, sends an MPS officer photographs of Falun Gong protesters, and if we look at page 2, where the MPS officer asks the defendant whether a particular person practiced Falun Gong in the U.S.

Now, the defendant told the FBI when he was interviewed that the MPS would ask him to find information on the Falun Gong.  You saw one of the examples here in the exhibit.  Or later, let's look at page 24.  When the defendant

EXCERPT PROCEEDINGS                              14

and the MPS officer have a nearly 27 minute call, and then the

defendant sends a photograph of a supplementary criminal

report, what good deed is that?  Let's look at Government

Exhibit 355-T.  This is when MPS Officer Liu called the

defendant for a minute and 13 seconds and then sends him all

sorts of information about Mr. Xu, where he was born, where

he's from, where and when he moved, his workplace.

And the defendant takes the assignment and he

reaches out to Keith Chung.  Now, Mr. Carman wants you to

wonder what Keith Chung did because he doesn't want you to

look at what the defendant did.  Ladies and gentlemen, it's a

distraction.  And by the way, Mr. Xu, you heard, he knows

nothing about these messages.  He knows nothing about this

case, knows nothing about the defendant, about Liu Rongyan,

about any of it.  You heard about many of these exact details

in Mr. Xu's testimony, the year he was born, the place he was

born, the name of his business, the address of his human

rights organization in California, 695 Holt Avenue.  You heard

about his home in Pomona in Los Angeles.

You also heard from Mr.  Xu why the Chinese

government was targeting him.  You heard it in Mr. Xu's own

words.  He participated in those 1989 protests that Professor

Ku told you about and that you may know about.  He advocates

vocally for democracy, for human rights in China.  He fled

China to Laos to the United States to escape the regime there

*Nicole Sesta, RPR, RMR, CRR*
*Official Court Reporter*

EXCERPT PROCEEDINGS                                    15

and the harassment and the intimidation efforts have followed him everywhere he's gone.

Now, before we continue on about good deeds, I want to take a moment to address an argument that Mr. Carman made about Mr. Xu. Now, Mr. Carman asked you to believe that MPS Officer Liu was looking for Mr. Xu for a personal matter, that she wasn't, I guess, operating in her official capacity. I think he said it seems like there's something else going on here.

Ladies and gentlemen, this is one of those places where your common sense can guide you. I suppose the argument goes that just because Officer Liu of the Ministry of Public Security didn't write this is for spying, this is for harassment, that means it's not, that means it's just personal? Ladies and gentlemen, that doesn't make any sense. That is not what people put in writing when they're talking about crimes.

You saw in the messages that the defendant and Officer Liu have no relationship but an official relationship. Special Agent Crossmore told you there are no messages between them of a personal nature and you saw none. There are no messages about friends or family. She is his boss and he works for her.

If all of this was for a friendly personal matter, why does Officer Liu insist that the defendant not contact

him, not contact Mr. Xu.  That doesn't make any sense either.  Most importantly, Mr. Xu fled China in 2013, 13 years ago.  I submit, ladies and gentlemen, he has no personal matters with any MPS officers.  This is exactly the type of tactic that Professor Ku told you about.  The defendant cannot hide behind the words "personal matter" when all of the evidence says otherwise.  Mr. Xu's purpose in coming here was pretty simple, tell you about himself, about the beliefs that he advocates for in videos that he told you has gotten over 27 million views.

And the defendant's messages about him with Officer Liu and then with Keith Chung, those have nothing to do with good deeds.  Now you learned during this trial that the station was disrupted months after it had launched.  But you saw in the messages what it was already starting to become, and that's just what we know about in writing.  By the way, if you want to know what the station was designed to do, look no further than what the Chinese government called it.  They didn't call it an overseas driver's license renewal office.  It was an overseas police station.

Now, Mr. Carman has gotten a lot of mileage out of not -- claiming to not know what that term means and about how it looks different than a police precinct here in the U.S.  Well, of course it's different.  It does not operate like a police precinct in the U.S.  It may not have been staffed with

EXCERPT PROCEEDINGS                    17

police officers or look like what a police agent that we're more familiar with might look like, but you saw what it did. You saw the things that it advertised and you saw the things it kept under wraps.

Now, defense counsel has also asked you to believe that just because this trial didn't feel like a James Bond movie, that no one is jumping out of airplanes or going on high speed chases, that that means this isn't foreign influence.  That just because there are emojis in the WeChat messages, that means this isn't spying.

Ladies and gentlemen, the reason that this doesn't feel like a movie is because it's not.  This is real life. This is intelligence gathering at work.  It is life.  This is subtle.  It's slow.  It doesn't start with a bang and get everybody's attention.  It doesn't advertise the more sinister things that it does.  It's regular people quietly doing the bidding of a foreign government.

You saw the cross-examination of Special Agent Perry.  He was the supervisor who works on national security cases.  Mr. Carman asked him whether he sees emojis and messages in his line of work.  He answered that question and he told you that he does.

Ladies and gentlemen, there is no emoji defense to acting as an agent of a foreign government.  In the messages that you read, in the testimony of Mr. Xu, you saw the very

EXCERPT PROCEEDINGS                     18

same tactics that Professor Ku told you about.  That's what I

means when I say it's the framework because that is how it

works in the real world.  You also heard how, according to Mr.

Carman, the defendant was an open book.  He was nothing but

cooperative when he spoke with law enforcement.  Ladies and

gentlemen, he admitted the things that he couldn't deny and

then he denied the things he couldn't admit.

He admitted to operating a police station.  There is

photos and videos and messages.  He knew part of the station

were public.  They were going to be seen.  He had no choice

but to admit to that.  When he knew something would look

particularly bad for him, he denied it.  Special Agent Perry

and Special Agent Crossmore both testified about what the

defendant said about deleting his WeChat messages.  He said he

did it accidentally.  Then he later said he didn't do it at

all.  Then he said he couldn't remember.  Then he said his

phone got stuck.

And he also lied to Special Agent Crossmore about

the task that he received from Officer Liu to locate Mr. Xu.

He lied about it.  That's some of the most damning proof,

ladies and gentlemen.

The defendant was not an open book, happy to

cooperate.  He may have shown his phone when he was asked, but

he had already deleted messages on it first.  The defendant

admitted what he couldn't deny and he denied what he couldn't

*Nicole Sesta, RPR, RMR, CRR*
*Official Court Reporter*

EXCERPT PROCEEDINGS                          19

admit.

Ladies and gentlemen, the defendant is not naive. He is not oblivious.  You saw the contacts from the defendant's phone, Government 356, more than 50 officers of the MPS stored there.  There are photos going back years showing that he is dealing with the MPS.  I submit to you, he knows who they are.  He knows what they do.

One more way you know the defendant wasn't just interested in good deeds is because you saw the way he tried to cover his tracks as soon as he learned the station had been searched on October 3rd.

Now, I think I heard defense counsel mention that there's no technical evidence that you heard about this deletion, but you did hear from Digital Forensic Examiner Jessica Volchko all the technical ways that she knows that evidence had been deleted from the phone she analyzed.  With respect to the defendant's phone, you saw the defendant tried to delete calls with his handler, with Officer Liu, and he tried to delete calls with his co-conspirators, people like Chen Jinping.  That was Government Exhibit 304.  The calls that the defendant deleted from October 2nd and 3rd from 2022 after the FBI's search of the station.

These were the calls that Examiner Volchko told you were marked for deletion and she checked to confirm that the user had, in fact, tried to delete them.  But she, the

EXCERPT PROCEEDINGS                                    20

examiner, could still see them in the phone.

She also told you in her testimony that this is not something the defendant does routinely.  He hadn't deleted all of his calls from October 2nd and October 3rd.  He had selectively deleted these calls, calls with his handler, calls with his co-conspirators.

And she also told you that for the full week prior to October 2nd she looked at that full week.  None of those calls had been marked for deletion.  He only deleted the calls that would look bad for him when he learned of the FBI's investigation.

Now, Ms. Volchko also walked you through Government's Exhibits 305 and 307 from the defendant's phone. You heard about them already but they're important.  I'll talk through them briefly.  Government Exhibit 307 shows you that the examiner found evidence of one-on-one WeChat conversations between the defendant and Officer Liu Rongyan.

You remember there's that call that refers to chat rooms and the ones that don't refer to chat rooms are one-on-one conversations.

These are files that are exchanged in one-on-one conversations, and some of those were marked for deletion, but she was still able to see them.

When you look for the corresponding conversations, where those files were shared, and Examiner Volchko told you

EXCERPT PROCEEDINGS                    21

she would expect, knowing that those files are there, she would expect to see a corresponding conversation on the phone and so she looked.  She told you they weren't there. No one-on-one messages between the defendant and his handler because they had been deleted.

(Continued on next page.)

*Nicole Sesta, RPR, RMR, CRR*
*Official Court Reporter*

EXCERPT PROCEEDINGS                          22

(Continuing.)

MS. OKEN:  You know the reasons why the defendant deleted these specific calls and these specific messages, because he never wanted anyone, certainly not law enforcement, to find out about them.

Now, on the subject of deletion, there is one last thing that I should mention, and it's in Government Exhibit 304.  If we could pull it back up and look at those first three rows.  These are the calls that you learned were from the FBI special agent who called the defendant, and the defendant tried to delete those calls too.  Now, ask yourself who is he hiding those calls from.  It's not the FBI.  The FBI knows they called him.  The defendant is worried.  He is worried that his boss, worried that the Chinese government will find out that he has gotten caught.

Now, I'm wrapping up soon, ladies and gentlemen. But this last piece is important.  Now, Mr. Carman kept using the station and the Changle Association interchangeably.  But they're really not the same thing.  Mr. Carman wants you to believe that the Changle Association is on trial here.  And I want to be very clear about this point.  The Changle Association is not on trial, and its values and its members are not on trial.

Ladies and gentlemen, you are all here because you live in the Eastern District of New York.  It's a district of

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

more than 8 million people.  Hundreds of different languages are spoken here.  People from all over the world, different nationalities, different cultures, they come here.  It's a place where people like Mr. Xu, they come when they're fleeing from a country that won't let them speak out for human rights. Mr. Xu decided to come here, to come to the U.S. because despite any imperfections we may all have, Mr. Xu testified that he admires the U.S.  In his words, living in America, at least we have the laws.  We protect people like Mr. Xu.  And when someone tries to threaten those protections, they are entitled to a fair trial.  And the Government must prove their guilt beyond a reasonable doubt.  What defense counsel said in his opening statement that the Changle Association should be a place where people can gather and celebrate their values and hold fundraisers and play ping pong and mahjong, he's right about that.  That is what it should be.  But the defendant took that away from them when he decided to use that space to open a satellite office for the Chinese government.  The Government didn't get the Changle Association wrapped up in this case, the defendant did.

Ladies and gentlemen, Mr. Carman would have you believe that this is a complicated case.  But the elements are quite straightforward and the evidence is too.  There are photographs and videos of the defendant at the launch ceremony in China and operating the station here in New York.  There

EXCERPT PROCEEDINGS                               24

are WeChat messages between the defendant and his handler and his co-conspirators.  You saw written instructions for how they had to run the station.  You saw cell phone evidence from the defendant's phone that he tried to delete.  You saw the parts of the station that were advertised and the parts of the station that were hidden.  You saw all of that and you can believe your own eyes.  When the defendant tried to delete his calls and his WeChat messages, he had a day like today in mind, a day when all of the evidence would be laid out inside of a courtroom like this one.  Today is that day and it is now time to hold him accountable, to find him guilty.  Not because I say so, not because Ms. Rangel says so, find him guilty because the evidence says so.

Thank you.

THE COURT:  Thank you very much.

All right.  At this time, ladies and gentlemen, I'm going to excuse you for a short break while I discuss the final charging instructions and any remaining issues with the lawyers before we bring you back for me to read you the jury charge and then have you begin your deliberations.  So we'll have you step out now.  Again, please don't discuss the case until you've heard all of my instructions.

Thank you.

(Jury exits the courtroom.)

THE COURT:  Okay.  Please be seated, everyone.

Before we turn to the charge and any last comments you all have, I have a concern that I need to raise about one aspect of Ms. Oken's rebuttal.  Allow me for a moment to pull it up.  It has to do with -- let me pull it up now so I have the full quote.

Despite the fact that at the pretrial conference and in the motions in limine we discussed and clarified at length that the Government was not going to, in any way, argue that this case was about espionage or spying or anything of that nature -- hold on let me finish please -- in rebuttal, the quote that I have in the realtime transcript, I heard Ms. Oken say, much to my surprise -- and this is what I am reading back from the rough transcript -- Now, defense counsel has asked you to believe that just because this trial didn't feel like a James Bond movie, that no one is jumping out of airplanes or going on high-speed chases, that means this isn't foreign influence, there are emoji in the WeChat messages, that means this isn't spying.  Ladies and gentlemen, the reason that this doesn't feel like a movie is because it's not.  This is real life.  This is intelligence gathering at work.  It is life.  This is subtle, it is slow, it doesn't start with a bang and get everybody's attention, it doesn't advertise the more sinister things that it does.

Ms. Oken, how do you reconcile that with what you assured me from the outset of this case would not be argued by

the Government?

MS. OKEN:  Your Honor, that is not my recollection of the pretrial conference.  I'll pull up the transcript right now, but that motion was withdrawn by defense counsel.

THE COURT:  Okay.  I did pull up the transcript while you were speaking, because I wanted to make sure that that was exactly what we had.  So here is what we have, there's a quote from Page 86 of the pretrial transcript which says:  Then lastly, I believe, one of the last ones, motion six -- this is seem to me speaking -- by the defense about references to espionage and national security, the Government has clarified that it will not use terms like espionage and won't have its witnesses use terms like espionage or spying, but does seek some latitude to broadly describe the statutes under which Mr. Lu is charged, particularly, 951, as serving a national security purpose, because there is a reason why Congress adopted the statute to require registration even if the conduct itself would not constitute a threat to national security.

And with that caveat, I gave you latitude to discuss national security concerns with it being clear that you would not use terms like espionage.

Similarly, before the pretrial conference, ECF Number 95 at 21, Note 5, in response to the defense's motion to preclude you from using such terms, you and your cocounsel

wrote -- and I quote -- The Government does not intend to describe the defendant's conduct with respect to Victim 3 as espionage.  As such, the defendant's motion to preclude the Government's use of the term espionage is moot.  And I agreed with you based on that representation.

MS. OKEN:  Yes, Your Honor.

The motion that the defense filed referred to several specific terms, spying, national security, espionage. We took each of those individually.  I don't recall using the term espionage in rebuttal.  But I do recall referring to spying and to national security, which I'm still pulling up the transcript from the pretrial conference.

THE COURT:  So are you saying -- I'm happy to give you some time to review it.  But are you saying that the quote I just read back to you from your rebuttal that says the word spying and then says intelligent gathering is not the same as espionage, that there's a meaningful difference between intelligent gathering and espionage for this purpose?

MS. OKEN:  Your Honor, I think that it falls within the umbrella of spying, which is a term that we represented we intended to make arguments about in this case.

THE COURT:  Tell me what is the difference between spying and espionage?

MS. OKEN:  The distinction is not one that we drew, Your Honor.  It's a distinction that was in the defense's

motion that cited specific terms.

THE COURT:  Okay.  I mean, I'm not sure that I understand the difference here.  I think we made it very clear, very clear that you were permitted to argue agent of a foreign government, you're permitted to argue direction and control, and I would give you some latitude to talk about the broad national security purposes served by the statute, but you were not in any way to suggest or insinuate to the jury that Mr. Lu was charged with or conducted or committed an act of espionage or that he was working as a spy or a secret agent in that capacity on behalf of the foreign government.  That is, being asked to locate someone and provide information to the MPS as an overt act that was being charged, that this was not going to be tried as an espionage case, and I made that perfectly clear.

MS. OKEN:  Your Honor, what we understood from the briefing, and we have briefed this statute further since that time, is that this is a statute that derives from the Espionage Act, and Courts characterize it as a spying statute. And so the purpose of that argument was to rebut the notion that this is what Mr. Carman characterized as a paperwork offense.  It is not a paperwork offense.  It is a statute that serves national security purposes that Courts characterize as a derivative of the Espionage Act.

THE COURT:  So let me ask you this:  At ECF 95,

EXCERPT PROCEEDINGS                    29

21 -- Page 21, Note 5, your response to the defendant's motion in limine filed a month ago you wrote, quote, The Government does not intend to describe the defendant's conduct with respect to Victim 3 as espionage.  Period.

Are you now saying that because you used the term spying and intelligence gathering and did not use the word espionage, that you are true to your word to me in that sworn document?

MS. OKEN:  Your Honor, again, we talked about very specific terms, about -- the motion referred to espionage, spying, and national security.  This is a spying and national security statute.  I apologize if we talked about past each other at the pretrial conference.  That certainly was not my intention to run afoul of any ruling.  But our intention was in rebuttal, in rebutting the suggestion that this is about paperwork and nothing more nefarious than that, was to invoke the statute's purpose and line it up with the conduct here. This is a statute that does cover spying.  It is a statute that has, like I said, its origins in the Espionage Act. That's why Courts characterize it that way, as an espionage statute.

And I thought the motion practice was very clear about what we did and did not intend to argue, and I will --

THE COURT:  I did too.

MS. OKEN:  I will take a look back --

THE COURT:  We agree on that.  It couldn't have been more clear.  You said it in your papers and then I repeated it at the pretrial conference which you have a transcript of, and it literally did not come up in this entire trial until five minutes ago.

MS. OKEN:  Your Honor, I think it did come up in openings.

THE COURT:  What came up in opening?

MS. OKEN:  I think a reference to spying came up in openings.  It came up in both parties' openings, and it came up in both parties' closings.

THE COURT:  All right.  That is not my recollection. We certainly can go back and take a look.

MS. OKEN:  Sure.

THE COURT:  You know, it is -- let me just say this: I was reviewing in anticipation of some of the motions you all made and the issues that you raised with respect to summation over the weekend, some of the caselaw and the proper bounds of summation.  I came across this case by Judge Leval on the Second Circuit, U.S. versus Spinelli, 551 F.3d 159, 170, Note 5, (2d Cir. 2008) in which you wrote in concurrence as he underscored speaking for himself alone and not for the panel, that quote, in 30 years of judging, this judge has seen numerous instances in major cases in which experienced prosecutors have overreacted to defense arguments and made

serious errors in their rebuttal summation, risking mistrial and imperilling the record on appeal.

I was concerned when I heard your rebuttal that you may have crossed that line.  I hope that is not the case.  I don't know that the bell can be unrung at this point.  We have not charged the jury and I do not intend to charge the jury with anything involving espionage or spying or intelligence gathering or anything of the like.  I don't know that anything can be done at this point.  But the record is what it is.  And if it becomes an issue, that may be something you need to take up with the Court of Appeals.  At this point, I think we are where we are.

MS. OKEN:  Thank you, Your Honor.

THE COURT:  Let me hear from the defense on anything related to what I've just discussed.

MR. CARMAN:  Your Honor, all I would say is on that Wednesday last week, I opened on the idea that this was a failure to file a form case.  That was the principle messaging of my opening.  So to the extent that the Government decided at some point they needed to be relieved from that commitment to the Court about using the term spying and/or espionage, it seems to me there was a lot of time to address that with the Court since my Wednesday opening.  And so --

THE COURT:  And my recollection -- we can all go back and look, but my recollection of the opening was that all

Mr. Carman did was say that he was not arrested for spying or espionage, but instead, he was arrested for conspiracy to act as a foreign agent and for acting as a foreign agent, that he was drawing a distinction between what he was and wasn't charged with, which was exactly the bounds that we talked about.

We can all go back and look, but I don't recall it as being anything other than that.

MS. OKEN:  I think we would appreciate the opportunity to go back and look and brief it for, Your Honor.

THE COURT:  I'm certainly not taking any briefing at this point, unless both parties are requesting that I send the jury home while we deal with it.  But I think we should charge the jury, unless somebody want to propose something else.

MR. CARMAN:  I would just like to note for the record that the defense is moving for a mistrial.

THE COURT:  Okay.  All right.  I'm going to deny that you without prejudice to renew in a Rule 29 motion.  At this point I'm not confident that the prejudice is sufficient to warrant the extreme sanction of a mistrial, but I will certainly not rule as to whether there was a violation or whether there was prejudice at this time.

MR. CARMAN:  Would you consider a curative instruction to the jury?

THE COURT:  What do you have in mind?

EXCERPT PROCEEDINGS                                            33

MR. CARMAN:  I would indicate to the -- I would ask you to indicate to the jury that the Government made references to spying activity on the part of the defendant and that was -- and/or espionage activity.  That was inappropriate and you should not consider it.

MS. OKEN:  Your Honor, we would appreciate an opportunity to look at the record first and to brief the actual purposes of the statute.

THE COURT:  We don't have time for you to brief with the purposes of the statute.  What I'm telling you is that when you did have time to brief the purposes of the statute four weeks ago in your response to the motion in limine, you said we will not use terms like espionage, period, full stop. Today you used terms like spying and intelligence gathering, and I don't think there's a fundamental difference.  So you can take a moment to confer, but I need to know your position on the defense's proposed curative instruction.  Since you didn't use the word espionage, I won't attribute that to you. But I think I can say that the Government's lawyer made reference to spying and intelligence gathering.  Mr. Lu is not charged with those offenses, those references were not appropriate, and you should disregard them.

I'd like to know your position.  It may cure the problem that I've identified if I'm correct about that or it may not.  But you should let me know.  Take a moment to confer

as to whether you object to me giving that instruction.  I know you have a supervisor or two in the audience.  If you'd like to confer with them, you can do so.  I'll give you some time.

Okay.  Let's go off the record, and I'll come back in five minutes.  Thanks.

Actually, before we do, do the parties have anything else to take up with respect to the charge?

MS. OKEN:  No, Your Honor.

MR. CARMAN:  No.

THE COURT:  Okay.  Thank you.

(A recess was taken.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  You can all be seated.  Thanks.

Let's go back on the record.  I see the parties were conferring with one another when I came back in.

Do you need a bit more time to speak to each other?

MS. OKEN:  Sure.  I think it might be helpful to put on the record what we were beginning to discuss, which is, I think the starting point for this, Your Honor, is that there was a motion from the defense to preclude references to terms like national security, espionage, the Government responded, opposed that request, we spoke about it, somewhat briefly, but it was discussed at the pretrial conference, and sort of the final note of that discussion was a reference from Mr. Carman

indicating that I've had some time to think about that objection since we filed it.  I don't know that a general discussion about national security interest is something we'd object to.  I think it's part and parcel of the case, so to the extent that could be characterized as an objection by us, I would withdraw that part of it.

So I wanted to have a moment to confer with Mr. Carman because I understood that as a withdrawal of the objection, and I understood that the Government would have latitude in its jury addresses -- not through witnesses which we didn't elicit, although some of that did come in on cross-examination, but we didn't elicit references to those terms in our questioning.  But we did understand that there was some latitude to discuss it in jury addresses.  So I did want to take a moment to talk to Mr. Carman about that, and you know, I think I separately would like to make the record sort of about the ways in which these terms got injected into this trial.  It may be helpful if we can take a moment now to confer if Your Honor thinks that might be --

THE COURT:  Sure.  Just while it's fresh in my mind, let me say that what you just read back to me, Mr. Carman withdrew that portion of the objection that related to national security.  He did not withdraw -- because the Government represented that it was moot -- the portion of his motion that said that he did not want you to be allowed to use

EXCERPT PROCEEDINGS                                            36

the terms espionage or the like, and as I read to you previously, you said in writing where there's no ambiguity that you do not intend to describe the defendant's conduct with respect to Victim 3 as espionage and you said that the motion to preclude the Government's use of the term espionage is moot.  So we've been over this.  But that is my concern.  I don't think that the pretrial conference record is ambiguous with respect to what the Government was and was not allowed to speak of in that regard.

Similarly, I did go back and look at the opening statement that Mr. Carman gave, and I think that the relevant portion -- and you can tell me if there's something else that you're referring to -- hold on.  Let me pull it up.  Sorry give me one second.  It disappeared from my screen.  There we go.

From day -- in the opening at 515, he said, Half a year or more a year after that in June of 2023 -- meaning after the search warrant was executed -- nine months after the search of Changle, Mr. Lu was arrested at his apartment in the Bronx, not for espionage, not for spying, not for conspiracy to overthrow the Government.  So I don't see how in any way the defense saying this is not what he is on trial for opens the door to the Government saying this is what he actually did.

So that is my understanding of what happened in the

opening.  If you all want to continue to confer, I can give you a bit more time, and I'm happy to leave while you do that. But let's try to keep it to five minutes and see where we are because we have a jury waiting.

MR. CARMAN:  I don't think there's a lot to talk about, to be honest.

THE COURT:  Okay.  All right.  Why don't you speak for a minute now and see if there's anything you want to discuss about the proposed curative instruction or others.

I have denied the defense's motion for a mistrial without prejudice, so I do intend to let the jury deliberate, and then we'll see where we are after that.

What is the Government's position on -- well, do you want to confer for a moment about the curative instruction?

MS. OKEN:  Might as well.  Thank you, Your Honor.

THE COURT:  We'll go off the record, but I'll stay here.  Thanks.

(A recess was taken.)